*Edwina Reid, et al. v. Baltimore Ambulatory Center for Endoscopy, LLC, et al.*, No. 2349, Sept. Term, 2023. Opinion by Arthur, J.

**HEALTH CARE MALPRACTICE CLAIMS ACT—EXPERT WITNESSES**

The Health Care Malpractice Claims Act imposes certain qualification requirements for any expert who renders an opinion about an applicable standard of care. If a defendant health care provider is board certified in a specialty, an expert may not opine that the defendant departed from the standard of care unless the expert is "board certified in the same or a related specialty as the defendant." Md. Code (1974, 2020 Repl. Vol.), § 3-2A-02(c)(2)(ii)1B of the Courts and Judicial Proceedings Article. Generally, two specialties are "related" if there is an overlap in treatment or procedures within the specialties and the treatment or procedures for which the overlap exists is at issue in the case.

In this case, plaintiffs brought medical negligence claims against a board-certified gastroenterologist who performed an endoscopy at an ambulatory surgery center, under anesthesia administered by an anesthetist. The plaintiffs offered expert testimony from a board-certified anesthesiologist, who opined that the gastroenterologist violated the standard of care in the post-procedure discharge assessment of the patient. The record established that, in the procedure at issue, a gastroenterologist collaborates with an anesthesiologist (or anesthetist) and the two types of specialists share some common responsibility for post-procedure care. The expert asserted that the standard of care for the post-procedure discharge assessment would be the same for either specialist.

Under the circumstances, the "related specialty" requirement of the Health Care Malpractice Claims Act did not prohibit the expert anesthesiologist from offering opinion testimony about the standard of care for the post-procedure assessment performed by the defendant gastroenterologist.

**APPEAL AND ERROR—NON-PREJUDICIAL ERRORS**

To justify setting aside a jury verdict in a civil case, the appellant must show not only that an error occurred but also that the error probably affected the verdict. In this medical negligence case, the circuit court erroneously granted summary judgment in favor of one defendant health care provider. The case proceeded to trial against two other defendant health care providers, and the jury found no violation of the applicable standards of care by those two defendants.

Under the circumstances, the erroneous grant of summary judgment in favor of one defendant did not provide a basis to overturn the verdicts in favor of the other defendants. The record established no substantial likelihood that the lack of evidence of negligence by one defendant affected the jury's assessment of whether the other two defendants violated an applicable standard of care. Although the appellants also contended that the

court made other errors at trial, each of the challenged rulings pertained to issues unrelated to whether those two defendants violated the applicable standards of care. Accordingly, the appellants failed to show a likelihood of prejudice.

**MEDICAL MALPRACTICE CLAIMS—CONTRIBUTORY NEGLIGENCE**

Maryland appellate courts have upheld the submission of the issue of contributory negligence to a jury in medical malpractice cases only where there is evidence that the patient did not follow, or unreasonably delayed in following, instructions given by a treating health care provider.

In the present case, plaintiffs alleged that defendant health care providers violated the applicable standards of care by failing to discharge the patient by wheelchair after a procedure performed under anesthesia and that this violation caused him to fall while walking to his car outside the facility. The defendants contended that they were entitled to a jury instruction on the issue of contributory negligence, based on evidence indicating that the patient tripped on the edge of a sidewalk when he fell. Because there was no evidence that the patient failed to follow, or unreasonably delayed in following, any instructions from his health care providers, the evidence did not properly generate an affirmative defense of contributory negligence.

REPORTED*

IN THE APPELLATE COURT

OF MARYLAND

No. 2349

September Term, 2023
_____

EDWINA REID, ET AL.

v.

BALTIMORE AMBULATORY CENTER
FOR ENDOSCOPY, LLC, ET AL.

_____

Graeff,
Arthur,
Woodward, Patrick L.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Arthur, J.
_____

Filed: February 27, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

TABLE OF CONTENTS

Factual and Procedural Background...................................................................................1

    A.      Procedure at Baltimore Ambulatory Center for Endoscopy................................1

    B.      Mr. Reid's Injuries and Death.............................................................................4

    C.      Medical Negligence Claims .................................................................................5

    D.      Dr. Khan's Motion for Summary Judgment........................................................7

    E.      Trial Against CRNA Sergott, Nurse Dinisio, and BACE....................................11

Discussion.........................................................................................................................20

    I.    Order Granting Dr. Khan's Motion for Summary Judgment ............................21

        Related Specialty Requirement of Health Care Malpractice Claims Act ..............22

        Standard-of-Care Opinions from Dr. McAlary .......................................................31

        Standard-of-Care Opinions from Dr. Krasnow .......................................................40

        Reversal of Summary Judgment Ruling..................................................................42

    II.    Jury Verdicts in Favor of CRNA Sergott and Nurse Dinisio ...........................42

        Likelihood of Prejudice from Summary Judgment Ruling .....................................42

        Likelihood of Prejudice from Other Rulings at Trial..............................................46

        Affirmance of Judgments in Favor of CRNA Sergott and Nurse Dinisio .............54

    III.    Judgment in Favor of Defendant BACE.........................................................54

        Causation Testimony from Dr. Krasnow ................................................................55

        Opinion Testimony about BACE's Policies............................................................58

        Omission of Questions about Agency from Verdict Sheet ......................................62

        Availability of Contributory Negligence Defense...................................................65

        Claims of "Independent Negligence" by BACE .....................................................73

Conclusion ........................................................................................................................77

Appendix A........................................................................................................................A1

Appendix B ........................................................................................................................A3

On the morning of October 13, 2015, Carroll Reid underwent an upper endoscopy at an ambulatory surgery center in Baltimore County. While walking back to the parking lot outside the facility, Mr. Reid fell to the ground and injured his back. He died two weeks later from complications related to emergency spinal surgery.

Mr. Reid's surviving family members brought a medical negligence and wrongful death action in the Circuit Court for Baltimore County against health care providers associated with the ambulatory surgery center. The court granted summary judgment in favor of the gastroenterologist who performed the endoscopy, concluding that the plaintiffs lacked any expert qualified to testify about the standard of care for a gastroenterologist. After an eight-day trial, the jury found no violations of the applicable standards of care by the nurse anesthetist who administered anesthesia to Mr. Reid or by the licensed practical nurse who monitored him after the procedure.

The plaintiffs have appealed. For the reasons discussed in this opinion, we conclude that the circuit court erred when it granted summary judgment in favor of the gastroenterologist. We further conclude that the plaintiffs have failed to establish any prejudicial error affecting the verdicts in favor of the nurse anesthetist or the licensed practical nurse. We will reverse the judgment in part and remand the case for further proceedings to adjudicate the claims against the gastroenterologist, a company owned by the gastroenterologist, and the company that operates the facility.

FACTUAL AND PROCEDURAL BACKGROUND

**A.    Procedure at Baltimore Ambulatory Center for Endoscopy**

On October 9, 2015, gastroenterologist Jahangir Khan, M.D., evaluated Carroll

Reid for complaints of indigestion and difficulty swallowing. For more than 10 years before the evaluation, Dr. Khan had treated Mr. Reid for various gastrointestinal issues, including chronic gastroesophageal reflux disease.

Dr. Khan recommended that Mr. Reid undergo an upper endoscopy with biopsies and dilation. In the procedure at issue, a gastroenterologist inserts a flexible tube into the patient's mouth so that a small camera can pass through the esophagus and into the stomach and part of the small intestine. Typically, an anesthesiologist or anesthetist administers sedation so that the patient can tolerate the procedure safely. Dr. Khan scheduled the procedure to occur on October 13, 2015, at an outpatient surgical facility operated by Baltimore Ambulatory Center for Endoscopy, LLC ("BACE").

At the time of the procedure, Mr. Reid was 76 years old and weighed more than 270 pounds. In his evaluation records, Dr. Khan classified Mr. Reid as morbidly obese. Dr. Khan reviewed Mr. Reid's history of medical conditions, which included diabetes, diabetic neuropathy, and hypertension. Mr. Reid disclosed his current medications, which included medication to control his blood pressure.

Although Mr. Reid drove with a handicap placard because of neuropathy affecting his feet, he was able to walk without assistance. Mr. Reid worked part time as a security guard at Franklin Square Medical Center, where his duties often required him to patrol buildings or to escort patients on foot. Mr. Reid had no documented history of falls, except for one instance in which he slipped on an icy surface.

Upon the scheduling of the procedure, Mr. Reid received a document notifying him of BACE's "Transportation Policy." The document informed Mr. Reid that he

would need a responsible adult to accompany him when leaving the facility and that he would not be allowed to drive a vehicle for at least 12 hours after the procedure.

Two days before the procedure, Mr. Reid discussed the risks of anesthesia with Gary Sergott, a certified registered nurse anesthetist (CRNA). Mr. Reid signed a consent form in which he agreed that CRNA Sergott would administer anesthesia during the procedure under the supervision of Dr. Khan. CRNA Sergott reviewed Mr. Reid's medical history and current medications in preparation for the procedure.

Mr. Reid's wife, Edwina Reid, accompanied him to the BACE facility on the morning of October 13, 2015. Following instructions from Dr. Khan, Mr. Reid had not eaten anything since 10:00 p.m. on the previous night. Upon admission, Mr. Reid received additional instructions advising him that he should not drive, operate machinery, or drink alcohol for at least 12 hours after the procedure and that he should avoid making critical decisions or signing legal documents on that day. The instructions noted that "[s]ome patients may experience light-headedness and fatigue" after sedation.

After a pre-procedure assessment, CRNA Sergott used an intravenous line to administer two short-acting sedative drugs, Propofol and Versed, to Mr. Reid. Dr. Khan started the endoscopy at 6:50 a.m. and completed it four minutes later. As Mr. Reid regained consciousness, CRNA Sergott transported him on a stretcher, with the side rails up, to a nearby recovery room at 6:58 a.m.

CRNA Sergott gave a report of the procedure to Darlene Dinisio, a licensed practical nurse (LPN). After Nurse Dinisio took initial measurements of Mr. Reid's vital signs, CRNA Sergott left to attend to his next patient. Nurse Dinisio then monitored Mr.

3

Reid for approximately 30 minutes. As part of the recovery assessment, Nurse Dinisio recorded periodic measurements of Mr. Reid's blood pressure from a sitting position.

At the time of the procedure, BACE's policies required each patient to be approved for discharge by the physician, or by the nurse anesthetist if the physician was unavailable. Records made by Nurse Dinisio indicate that Dr. Khan approved Mr. Reid for discharge at 7:28 a.m.

### B.      Mr. Reid's Injuries and Death

After discharge, Mr. Reid walked out of the BACE facility, accompanied by Ms. Reid. They planned to drive to a nearby diner for breakfast before returning home. As they approached their vehicle, Ms. Reid walked ahead of Mr. Reid to open the passenger door for him. Ms. Reid suddenly heard Mr. Reid cry out in pain and saw that he had fallen on the sidewalk. Ms. Reid rushed back to the building and asked BACE employees to call 911. When emergency medical technicians arrived a few minutes later, Ms. Reid told them that Mr. Reid "tripped on [the] sidewalk and fell."

An ambulance transported Mr. Reid to the emergency room at Franklin Square Medical Center. In addition to suffering abrasions on his right arm and left knee, Mr. Reid reported intense lower back pain. X-ray images of Mr. Reid's lumbar spine (vertebrae in his lower back) showed no visible fractures. On the following day, Mr. Reid's primary care physician ordered additional X-rays of his thoracic spine (vertebrae in his middle and upper back). Those X-ray images also showed no sign of a fracture.

Despite prescription pain medication, Mr. Reid continued to suffer intense back pain that did not improve. He required a walker to move inside the home, and he slept on

4

a reclining chair because it was too painful for him to get into or out of bed. After ten days at home, Mr. Reid reported pain so intense that he was unable to move.

On October 24, 2015, Mr. Reid returned to the hospital, where physicians ordered an MRI. The MRI images showed an unstable fracture in two thoracic vertebrae. Mr. Reid underwent emergency surgery in an attempt to stabilize the fracture, but the motor activity in his lower extremities temporarily stopped, and he suffered nerve damage during the surgery. Mr. Reid died after experiencing cardiopulmonary arrest on the morning of October 29, 2015. The medical examiner described the cause of death as "[c]omplications of thoracic spine fracture."

## C.     **Medical Negligence Claims**

Mr. Reid was survived by his wife, Edwina Reid, and their three adult children. On May 8, 2019, Mr. Reid's surviving family members filed a medical malpractice complaint in the Circuit Court for Baltimore County.[1]

The complaint raised claims against BACE and four other health care providers: Jahangir Khan, M.D.; Jahangir Khan, M.D., LLC, a company owned by Dr. Khan; Gary Sergott, CRNA; and Darlene Dinisio, LPN. The complaint alleged that the latter four defendants, at all relevant times, acted as employees or agents of BACE.

The complaint alleged that, based on Mr. Reid's medical history, the defendants should have known that he presented "a severe fall risk" while recovering from

---

[1] Before they filed suit, the Reid plaintiffs filed claims with the Health Care Alternative Dispute Resolution Office. They elected to waive arbitration, and the Director transferred the matter to an appropriate trial court.

anesthesia on October 13, 2015.  The complaint also alleged that the defendants violated the applicable standards of care by failing to identify Mr. Reid as a fall risk, by failing to make proper assessments of his condition before discharging him, and by permitting him to leave without a wheelchair or other mobility aid.  The complaint alleged that these violations caused Mr. Reid to fall outside the facility and that the fall caused the injuries that ultimately resulted in his death.

The complaint included one count for negligence and one count for wrongful death.  Ms. Reid, as personal representative of the estate of Mr. Reid, sought damages for injuries, including pain and suffering, that he suffered as a result of the fall.  Ms. Reid and Mr. Reid's three children sought damages for injuries resulting from his death, including mental anguish, emotional pain and suffering, and loss of society.

Along with the complaint, the plaintiffs filed certificates of a qualified expert from two physicians: Steven H. Krasnow, M.D., a hematologist and oncologist; and Brian G. McAlary, M.D., an anesthesiologist.  Both experts opined that the defendants violated the applicable standards of care in their treatment of Mr. Reid, that the violations caused his injuries, and that his injuries were a substantial factor in causing his death.  Dr. Krasnow opined that the defendants violated the standard of care by discharging Mr. Reid without making a proper assessment of his blood pressure.  Dr. McAlary opined that the defendants violated the standard of care by permitting Mr. Reid to leave the facility without a wheelchair.

6

## D. Dr. Khan's Motion for Summary Judgment

After discovery, Dr. Khan filed a motion for summary judgment.[2] In support of the motion, Dr. Khan provided excerpts of deposition testimony from the two expert witnesses identified by the plaintiffs, Dr. Krasnow and Dr. McAlary. Dr. Khan argued that neither witness was qualified to testify about the standard of care applicable to a gastroenterologist.

As the sole ground for his motion, Dr. Khan relied on requirements of the Health Care Malpractice Claims Act concerning expert witnesses. Under the Act, a medical expert may not give opinion testimony concerning a defendant's departure from the standard of care unless the expert has "had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care" within five years of the conduct giving rise to the claim. Md. Code (1974, 2020 Repl. Vol.), § 3-2A-02(c)(2)(ii) of the Courts and Judicial Proceedings Article. Subject to certain exceptions, the Act provides that, "if the defendant is board certified in a specialty," the expert "shall be board certified in the same or a related specialty as the defendant." *Id.* § 3-2A-02(c)(2)(ii)1B.

In his motion, Dr. Khan explained that he is board-certified in gastroenterology. Dr. Khan observed that the plaintiffs had identified two purported experts on the standard of care: Dr. Krasnow, who is board-certified in internal medicine, hematology, and

---

[2] Dr. Khan moved for summary judgment jointly with defendant Jahangir Khan, M.D., LLC. For the sake of simplicity, this opinion will refer to the arguments made by those two defendants as arguments made by Dr. Khan.

oncology; and Dr. McAlary, who is board-certified in anesthesiology. As Dr. Khan observed, neither expert is board-certified in gastroenterology.

Dr. Khan explained that the first purported expert, Dr. Krasnow, practices as an oncologist, specializing in the diagnosis and treatment of cancer. Dr. Khan asserted that Dr. Krasnow lacks any specialized training or knowledge in the field of gastroenterology and lacks any experience in clinical circumstances similar to those in which Dr. Khan treated Mr. Reid. Dr. Khan argued, therefore, that Dr. Krasnow was unqualified to offer opinions about the standard of care for a gastroenterologist performing an endoscopy at an ambulatory surgery center.

Dr. Khan provided a different rationale for challenging the qualifications of Dr. McAlary, a board-certified anesthesiologist. Dr. Khan tacitly acknowledged that Dr. McAlary has experience administering anesthesia for endoscopy procedures at ambulatory surgery centers. Dr. Khan argued, however, that anesthesiologists and gastroenterologists "have different knowledge and experience and their roles in the patient's care are exclusive." Dr. Khan contended that there was "no overlap" between the specialties of gastroenterology and anesthesiology under the circumstances of the case, and thus that the two specialties were not "related" within the meaning of the Health Care Malpractice Claims Act.

In their response to the motion, the plaintiffs made no argument about the qualifications of Dr. Krasnow and focused solely on the qualifications of Dr. McAlary. The plaintiffs provided an affidavit in which Dr. McAlary affirmed that he is a practicing anesthesiologist who has been board-certified by the American Board of Anesthesiology

8

since 1973. Dr. McAlary affirmed that, throughout the previous five years, he provided anesthesia services at ambulatory surgical facilities analogous to the BACE facility, including anesthesia services for gastroenterology patients undergoing endoscopies. Dr. McAlary stated that all of his opinions concerning Dr. Khan's departures from the standard of care "relate[d] to the postoperative management, care, and discharge" of Mr. Reid. Dr. McAlary stated that the upper endoscopy performed on Mr. Reid "is a similar and common procedure for which both gastroenterologists, and anesthesiologists (working in the setting of an endoscopic ambulatory surgical center), have experience." Dr. McAlary further stated that "the standard of care that would apply to a gastroenterologist[] and an anesthesiologist, related to the postoperative management, care, and discharge of a patient who had undergone an [upper endoscopy] procedure under anesthesia, would be identical."

Based on Dr. McAlary's affidavit and deposition testimony, the plaintiffs argued that there is a "significant overlap between the responsibilities of a gastroenterologist and an anesthesiologist in the setting of an ambulatory surgical center." Specifically, the plaintiffs argued that both a gastroenterologist and an anesthesiologist share responsibility for post-procedure care. The plaintiffs emphasized that Dr. McAlary did not offer any opinions about the performance of the endoscopy procedure itself. The plaintiffs asserted that Dr. McAlary's "criticisms of Dr. Khan relate[d] only to the postoperative management and discharge of Mr. Reid[.]" The plaintiffs contended that, in the context of the post-procedure care at issue, gastroenterology and anesthesiology were "related specialties" within the meaning of the Health Care Malpractice Claims Act.

9

On February 1, 2023, the circuit court conducted a hearing to consider Dr. Khan's motion for summary judgment. During the hearing, the court asked counsel for Dr. Khan whether gastroenterology and anesthesiology share any overlap in the context of the treatment at issue. Counsel for Dr. Khan admitted: "There's some overlap here." Counsel argued that, even though "there may be some overlap here," the two types of specialists do not provide care on "equal footing." Counsel argued that, relative to other specialists, Dr. McAlary has "much more advanced" knowledge, training, and experience concerning the risks associated with anesthesia drugs.

A few weeks after the hearing, the circuit court entered an order granting summary judgment in favor of Dr. Khan and Jahangir Khan, M.D., LLC. The court issued a written opinion explaining its decision.

In its opinion, the court reasoned that the "sole issue" to decide was "whether the specialties of gastroenterology and anesthesiology 'overlap' under the facts of this case." The court stated: "If they do, summary judgment must be denied. If they do not, it must be granted." The court reasoned: "In the case at bar, the issue of whether Mr. Reid should have been discharged as a fall risk and required the use of a wheelchair[] is not unique to the specialties of the Defendant (gastroenterology) and the Plaintiffs' expert (anesthesiology)." The court continued: "Under the Plaintiffs' analysis, an anesthesiologist could testify as an expert in any medical malpractice case against any surgeon with regard to postoperative discharge." The court stated that there was "no evidence of similar training" between gastroenterologists and anesthesiologists. The court concluded that "there is no 'overlap' . . . between anesthesiology and

10

gastroenterology" in the context of the case.

Within 30 days after the grant of summary judgment, the plaintiffs moved for reconsideration. In support of their motion, the plaintiffs offered a supplemental affidavit in which Dr. McAlary stated that practitioners in "all specialties of medicine" receive training for fall-risk assessments and that this training is "independent of a medical professional's specialty or subspecialty." The circuit court denied the motion for reconsideration without a hearing.

E.       **Trial Against CRNA Sergott, Nurse Dinisio, and BACE**

For eight days in January 2024, the circuit court conducted a jury trial on the medical negligence and wrongful death claims against CRNA Sergott, Nurse Dinisio, and BACE.

Ms. Reid testified that, on the morning of October 13, 2015, she accompanied her husband to the BACE facility and stayed in the waiting room until she was allowed to join him in the recovery room. Ms. Reid recalled that Mr. Reid was awake and sitting up when she arrived and that Nurse Dinisio was the only other person present. Ms. Reid testified that, once Mr. Reid stood up to leave, "Nurse Dinisio held his arm and walked out the hall with him and he felt like he wasn't feeling well." Ms. Reid continued: "So, she went and got a chair for him to sit on and we stayed about ten or fifteen minutes, and she came back and checked on him, then we left." Ms. Reid testified that Nurse Dinisio did not take any blood pressure readings during that time and that no one other than Nurse Dinisio examined Mr. Reid in the hallway.

Ms. Reid explained that, after they left the facility, she did not see Mr. Reid fall on

11

the sidewalk because she walked ahead to open the passenger door of their vehicle for him.  Ms. Reid recalled that, before the fall, Mr. Reid "was chatting about having breakfast," he did not seem "groggy or sleepy," and he was not "wobbling" but appeared "steady on his feet."  Ms. Reid admitted that, when she sought emergency assistance, she reported that Mr. Reid did not have any dizziness because she did not hear him mention any dizziness.  Ms. Reid admitted that she told one of the BACE nurses that Mr. Reid "fell over the height difference between the sidewalk and the dirt[.]"  Ms. Reid further admitted that, on the day after the fall, she told a physician that Mr. Reid fell because he "did not see a drop off of the ground next to the sidewalk and turned [his] foot on the edge of [the] sidewalk[.]"  Ms. Reid explained that she made those statements because she "presumed" that the fall had occurred in that way.

The plaintiffs called oncologist Steven Krasnow, M.D., as an expert in the field of internal medicine.  Counsel for the plaintiffs informed the court that Dr. Krasnow would offer opinions about causation issues and that he would not offer any opinions about standards of care.  Counsel proffered that Dr. Krasnow would testify, to a reasonable degree of medical certainty, that the anesthesia medication Propofol caused Mr. Reid to fall outside of the BACE facility.  After extensive questioning about his knowledge and experience, the court determined that Dr. Krasnow lacked sufficient expertise to opine that Propofol caused Mr. Reid's blood pressure to decline or that the decline in blood pressure caused his fall.  The court nevertheless permitted Dr. Krasnow to testify, in general terms, that Propofol "can" lower a person's blood pressure.

During their case-in-chief, the plaintiffs also presented testimony from Brian

12

McAlary, M.D., an expert in anesthesiology. Dr. McAlary explained that he is board-certified in anesthesiology and that he regularly provides anesthesiology services at ambulatory surgery centers, including services for gastroenterology patients undergoing endoscopy procedures.

Dr. McClary described a "fall risk" as a situation in which a patient's health conditions subject the patient to an increased risk of falling. Dr. McAlary stated that factors that increase the risk of falls include advanced age, obesity, hypertension (high blood pressure), diabetes, neuropathy, a history of falls, and certain medications. According to Dr. McAlary, "virtually all . . . anesthetic medications are known to increase fall risk." Dr. McAlary testified that, even without a formal scoring system, one way to perform a fall-risk assessment is to "eyeball the patient" and "glance at the medical record" for risk factors. Dr. McAlary opined, "[w]ithout a doubt[,]" that Mr. Reid was a fall risk after receiving anesthesia on October 13, 2015.

According to Dr. McAlary, the applicable standards of care required Mr. Reid's health care providers to make a fall-risk assessment before discharging him. Dr. McAlary stated that CRNA Sergott breached the standard of care by failing to advise Nurse Dinisio that Mr. Reid was a fall risk. Dr. McAlary opined that Nurse Dinisio breached the standard of care by failing to make a fall-risk assessment and by failing to make arrangements to transport Mr. Reid from the facility by wheelchair. Dr. McAlary further opined that, if Mr. Reid experienced difficulty walking, the standard of care required Nurse Dinisio to reassess his condition before allowing him to leave.

Dr. McAlary concluded that the failure to provide a wheelchair was "a major

13

cause" of Mr. Reid's injuries. In explaining that conclusion, Dr. McAlary emphasized that Mr. Reid was still "under the influence of anesthesia" and his blood pressure readings were "trending downward" at the time of discharge. Dr. McAlary opined that it was inadequate for Nurse Dinisio to measure Mr. Reid's blood pressure in a sitting position, rather than a standing position. According to Dr. McAlary, Mr. Reid's hypertension made it more likely that his blood pressure would continue to decline once he stood up and started walking.

Defendant Gary Sergott, CRNA, testified that, before October 13, 2015, he had administered anesthesia to Mr. Reid on ten other occasions for endoscopic procedures at the BACE facility. CRNA Sergott recalled that, on each of those occasions, Mr. Reid walked into and out of the facility without any mobility aid. CRNA Sergott testified that he was familiar with Mr. Reid's underlying medical conditions and knew that Mr. Reid was "very active" and "walk[ed] all the time" for his job as a security guard. CRNA Sergott stated that he administered two milligrams of Versed, a sedative drug, and 50 milligrams of Propofol, a short-acting sedative hypnotic, for the endoscopy. According to CRNA Sergott, this dosage was the lowest that he had ever used for any of Mr. Reid's procedures.

CRNA Sergott testified that, once the procedure ended, he transported Mr. Reid to the recovery room and gave a report to Nurse Dinisio. CRNA Sergott recalled that, after Nurse Dinisio recorded one set of vital signs, he left to attend to his next patient and never saw Mr. Reid again. CRNA Sergott testified that he believed that he had no need to advise Nurse Dinisio that Mr. Reid was a fall risk and no need to instruct Nurse

14

Dinisio to discharge Mr. Reid by wheelchair. In CRNA Sergott's assessment, Mr. Reid "didn't need" a wheelchair. CRNA Sergott explained that, under BACE's policies at that time, he had no responsibility to reassess a patient after providing a report to the recovery room nurse. According to CRNA Sergott, the physician, Dr. Khan, was responsible for making a discharge assessment. As the nurse anesthetist, CRNA Sergott would make a discharge assessment only if the physician was not physically present at the facility.

In his defense, CRNA Sergott called Nathaniel Apatov, Ph.D., who testified as an expert in anesthesia and the standard of care for a nurse anesthetist. Dr. Apatov opined that CRNA Sergott satisfied the standard of care for a provider of anesthesia services when he entrusted Mr. Reid to the care of Nurse Dinisio in the recovery room. In Dr. Apatov's opinion, the applicable standard of care did not require CRNA Sergott to advise Nurse Dinisio that Mr. Reid was a fall risk or to instruct Nurse Dinisio to discharge Mr. Reid by wheelchair. Based on Mr. Reid's medical records, Dr. Apatov concluded that Mr. Reid "was not a fall risk" and that there was "no reason" to discharge him in a wheelchair. Dr. Apatov further opined that, because Dr. Khan made the discharge assessment, the applicable standard of care did not require CRNA Sergott to make any additional assessment.

Defendant Darlene Dinisio, LPN, testified that, as the recovery room nurse, she was responsible for monitoring Mr. Reid's blood pressure and other vital signs in 10-minute intervals. Nurse Dinisio stated that, under BACE's policies, every patient needed to remain in the recovery room for at least 30 minutes after sedation. Nurse Dinisio explained that the standard procedures of BACE required her to use the "Aldrete scoring

15

system" to assess a patient's recovery. Under this system, the patient receives scores between 0 and 2 in five different categories. BACE's policies required a patient to reach a score of at least 8 out of 10 before discharge. At the time of discharge, Nurse Dinisio determined that Mr. Reid's score was 10 out of 10, meaning that he was able to move all extremities, he was breathing deeply, his blood pressure was within 20 percent of his pre-procedure blood pressure, he was fully awake, and his color was pink rather than pale or blue.[3]

On her post-anesthesia recovery records, Nurse Dinisio indicated that Dr. Khan reviewed the discharge instructions with Mr. Reid and Ms. Reid. One line of the pre-printed form stated "Pt. ready for discharge (D/C) after assessment by physician/CRNA @" followed by a blank space. Nurse Dinisio wrote "728" in the space, but she did not circle either the word "physician" or the word "CRNA" to indicate who made the discharge assessment. At trial, Nurse Dinisio could not recall whether Dr. Khan or CRNA Sergott made the discharge assessment for Mr. Reid. Nurse Dinisio explained, however, that the physician would make the discharge assessment whenever the physician was present in the building; the nurse anesthetist ordinarily was not required to make the discharge assessment. Nurse Dinisio testified that she "[a]bsolutely" believed that Dr. Khan was the one who made the discharge assessment.

---

[3] The plaintiffs' standard-of-care expert, Dr. McAlary, acknowledged that an Aldrete score generally is a reliable indicator that a patient may be discharged safely. Dr. McAlary nevertheless stated that an Aldrete score is not equivalent to a fall-risk assessment. Dr. McAlary opined that health care providers cannot rely on an Aldrete score alone, without other factors, to decide whether it is safe to discharge a patient.

16

Nurse Dinisio testified that, whenever one of her patients leaves the recovery room, she walks with the patient halfway down the hall toward the waiting room. Nurse Dinisio also testified that Mr. Reid reported that he was not dizzy or lightheaded and that she observed no problems with his walking. Nurse Dinisio denied Ms. Reid's claims that Mr. Reid reported that he was not feeling well and that he sat down in a chair in the hallway for several minutes. "That never happened[,]" she said. Nurse Dinisio stated that, if an event like that had occurred, she would have taken the patient for further monitoring and another assessment by the physician before the patient could leave.

In her defense, Nurse Dinisio called Carolann Schwartz, R.N., who testified as "an expert in nursing, with specific experience in post-anesthesia recovery care." Ms. Schwartz stated that, in her opinion, Nurse Dinisio satisfied the applicable standard of care in her treatment of Mr. Reid. Ms. Schwartz explained that nurses in outpatient surgery facilities ordinarily evaluate a patient's risk of falls without any formal scoring system, by assessing the patient's level of consciousness and whether the patient is feeling dizzy or drowsy. In Ms. Schwartz's opinion, the standard of care did not require Nurse Dinisio to discharge Mr. Reid by wheelchair. Based on the post-anesthesia records, Ms. Schwartz opined that Mr. Reid met "all of the expected standards" and appeared ready for discharge once Dr. Khan approved it.

Defendant BACE presented testimony from David Metro, M.D., an expert in anesthesiology and post-anesthesia care. Dr. Metro opined that the applicable standard of care did not require CRNA Sergott to advise Nurse Dinisio that Mr. Reid was a fall risk or that he needed a wheelchair. Dr. Metro also opined that Nurse Dinisio acted within the

17

standard of care when she decided that Mr. Reid did not need a wheelchair upon his discharge from the facility. Based on his review of the post-anesthesia records, Dr. Metro believed that Mr. Reid had sufficiently recovered from the anesthesia that he could be discharged safely without a wheelchair.[4]

The parties offered competing expert opinions on whether Mr. Reid's fall on October 13, 2015, caused the fractured vertebrae discovered on MRI images eleven days later. The plaintiffs presented testimony from Kenneth Lippman, M.D., an expert in orthopedic surgery. Dr. Lippman determined that the X-rays of Mr. Reid's spine showed that he suffered from ankylosing spondylitis, a condition that made his spine susceptible to fractures from "a low energy impact, like falling from a standing height." Dr. Lippman concluded that Mr. Reid suffered an unstable fracture when he fell outside of the facility and that this fracture was not visible on the initial X-rays because it had not yet become displaced.

The defendants countered with testimony from Jason Itri, M.D., an expert in diagnostic radiology, and Clifford Hinkes, M.D., an expert in orthopedic surgery. Dr. Itri and Dr. Hinkes opined that Mr. Reid did not have any fractured vertebrae at the time of the X-rays on October 13, 2015, and October 14, 2015. Both experts reasoned that it was unlikely that Mr. Reid could have sustained an unstable fracture that was not visible on

---

[4] In different ways, all three standard-of-care experts for the defendants expressed their opinions that it is preferable for patients to walk when leaving a recovery room. According to the defendants' experts, watching the patient walk allows the post-anesthesia care providers to make a more complete assessment of the patient's ability to walk safely outside the facility.

those X-rays.  Dr. Hinkes theorized that Mr. Reid probably suffered an insufficiency fracture, without any significant trauma, as the result of "some intervening event" unrelated to the fall.

During trial, the court ruled that, because the plaintiffs had presented no evidence that BACE violated any applicable standards of care, the jury could find BACE liable only on a theory of vicarious liability.  Counsel for BACE "stipulate[d] on the record" that Nurse Dinisio was an actual agent of BACE and that CRNA Sergott was at least an apparent agent of BACE.  Counsel agreed that BACE was vicariously liable for any negligence of CRNA Sergott or Nurse Dinisio.  Based on that stipulation, the court instructed the jury that CRNA Sergott and Nurse Dinisio "were acting as the employees or agents" of BACE and that BACE was responsible for injuries or damages caused by its employees or agents.

Two hours after closing arguments, the jury delivered a verdict in favor of the defendants.  The first question on the special verdict sheet asked: "Do you find that Gary Sergott, C.R.N.A. breached the standard of care in his treatment of Carroll Reid?"  The third question asked: "Do you find that Darlene Dinisio, L.P.N. breached the standard of care in her treatment of Carroll Reid?"  The jury answered "No" to those two questions. Following the instructions on the verdict sheet, the jury did not answer any of the remaining questions, which concerned whether a breach of the standard of care caused Mr. Reid's fall, whether Mr. Reid's own negligence contributed to his fall, whether the fall caused his death, and the amount of any damages.

On the same day that the jury rendered its verdict, the court entered judgments in

19

favor of CRNA Sergott, Nurse Dinisio, and BACE. The plaintiffs noted a timely appeal to this Court.

DISCUSSION

In this appeal, the Reid plaintiffs seek reversal of the judgment in favor of each of the defendant health care providers.[5]

First and foremost, the plaintiffs contend that the circuit court erred when it granted summary judgment in favor of Dr. Khan and Jahangir Khan, M.D., LLC. The plaintiffs further contend that, if this Court reverses the judgment as to Dr. Khan, it should reverse the judgment as to all defendants, including CRNA Sergott and Nurse Dinisio.

As discussed below, we conclude that the circuit court erred when it determined that the expert identified by the plaintiffs, Dr. McAlary, was unqualified to testify about the standard of care applicable to Dr. Khan. Consequently, we will reverse the judgment in favor of Dr. Khan and Jahangir Khan, M.D., LLC. We will also reverse the judgment in favor of defendant BACE, which is alleged to be vicariously liable for alleged negligence of Dr. Khan and Jahangir Khan, M.D., LLC. We conclude, however, that the record does not establish a likelihood that the summary judgment ruling affected the verdicts in favor of CRNA Sergott or Nurse Dinisio.

In addition to challenging the summary judgment ruling, the plaintiffs contend that the court made other reversible errors at trial. The plaintiffs argue that the court erred by:

_____

[5] Appendix A to this opinion reproduces the list of questions presented in the plaintiffs' appellate brief.

20

precluding certain expert opinion testimony about the effect of anesthesia on Mr. Reid's blood pressure; precluding expert opinion testimony about the adequacy of BACE's policies; failing to include a question on the verdict sheet about the negligence of defendant BACE; and submitting the issue of contributory negligence to the jury.

As discussed below, we conclude that the record shows no substantial likelihood that any of these purported errors affected the verdicts in favor of CRNA Sergott or Nurse Dinisio. Because some of these issues might recur at a new trial against BACE, we will discuss those rulings for the purpose of providing guidance on remand.

## I.     Order Granting Dr. Khan's Motion for Summary Judgment

A moving party is entitled to summary judgment if the motion and response show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Md. Rule 2-501(f). When deciding a motion for summary judgment, the court must construe "[t]he facts properly before the court as well as any reasonable inferences that may be drawn from them . . . in the light most favorable to the non-moving party." *Debbas v. Nelson*, 389 Md. 364, 373 (2005). The question of whether a party is entitled to summary judgment is a question of law. *Rodriguez v. Clarke*, 400 Md. 39, 70 (2007). This Court reviews the grant of summary judgment without deference, conducting the same analysis that the circuit court must conduct when deciding the motion. *Jabbi v. Adventist Healthcare, Inc.*, 264 Md. App. 659, 668, *cert. denied*, 490 Md. 636 (2025).

"To prevail in a medical malpractice negligence action, a plaintiff must prove four elements: '(1) the defendant's duty based on an applicable standard of care, (2) a breach

21

of that duty, (3) that the breach caused the injury claimed, and (4) damages.'" *Frankel v. Deane*, 480 Md. 682, 699 (2022) (quoting *American Radiology Servs., LLC v. Reiss*, 470 Md. 555, 579 (2020)). Expert testimony ordinarily is required to meet the burden of proving that a health care provider breached the applicable standard of care. *See Rodriguez v. Clark*, 400 Md. at 71. Accordingly, a defendant health care provider may be entitled to summary judgment "if the plaintiff fails to come forward with admissible expert testimony on [the] standard of care[.]" *Frankel v. Deane*, 480 Md. at 699-700 (citing *Rodriguez v. Clark*, 400 Md. at 72).

### *Related Specialty Requirement of Health Care Malpractice Claims Act*

The Health Care Malpractice Claims Act, codified at Md. Code (1974, 2020 Repl. Vol.), §§ 3-2A-01 to 3-2A-10 of the Courts and Judicial Proceedings Article (Cts. & Jud. Proc.), sets forth procedures for litigating medical malpractice actions under Maryland law. The Act governs all claims against a health care provider for medical injury in which an injured person seeks damages exceeding the limit of the concurrent jurisdiction of the district court. Cts. & Jud. Proc. § 3-2A-02(a)(1). The primary purpose of the Act is to screen out meritless claims, in order to reduce the costs of malpractice insurance and the overall costs of health care. *See, e.g.*, *Canton Harbor Healthcare Ctr., Inc. v. Robinson*, 492 Md. 1, 8 (2025) (citing *Adler v. Hyman*, 334 Md. 568, 575 (1994)).

The Act requires that any person pursuing a medical malpractice claim must initiate arbitration with the Health Care Alternative Dispute Resolution Office. Cts. & Jud. Proc. § 3-2A-04(a). Unless the sole issue in the claim is lack of informed consent, the claimant must file a "certificate of a qualified expert . . . attesting to departure from

22

standards of care, and that the departure from standards of care is the proximate cause of the alleged injury[.]" Cts. & Jud. Proc. § 3-2A-04(b)(1)(i)1. After filing a certificate, the claimant may elect to waive arbitration (Cts. & Jud. Proc. § 3-2A-06B(b)(1)) and file a complaint in the appropriate trial court. Cts. & Jud. Proc. § 3-2A-06B(f)(1).

Under the Act, a health care provider is not liable for damages "unless it is established that the care given by the health care provider is not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action." Cts. & Jud. Proc. § 3-2A-02(c)(1). The Act imposes certain qualification requirements for any medical expert who renders an opinion concerning the applicable standard of care. It provides, in pertinent part:

> 1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:
>
>> A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action[.]

Cts. & Jud. Proc. § 3-2A-02(c)(2)(ii)1A.

The Act imposes an additional qualification requirement if the defendant has board certification in a medical specialty. It provides that, "if the defendant is board certified in a specialty," the expert "shall be board certified in the same or a related specialty as the defendant." Cts. & Jud. Proc. § 3-2A-02(c)(2)(ii)1B. This provision

23

does not apply if "[t]he defendant was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified[,]" or if "[t]he health care provider taught medicine in the defendant's specialty or a related field of health care." Cts. & Jud. Proc. § 3-2A-02(c)(2)(ii)2A to 2B.

The General Assembly enacted the expert qualification requirements, along with other amendments to the Act, following the 2004 special legislative session. *See generally Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. 555, 571-73 (2022). "All of [these] enactments were in the nature of 'tort reform,' *i.e.*, were for the purpose of [rein]ing in medical malpractice cases and awards." *DeMuth v. Strong*, 205 Md. App. 521, 540 (2012). This Court has explained, however, that "the tort reform objective" of the Act "never has been to eliminate or limit liability in meritorious medical malpractice cases." *Id.* at 541. A proper interpretation of the Act "must not be so broad as to result in the consequence, clearly not intended by the legislature, of placing roadblocks to recovery in meritorious medical malpractice cases." *Id.* at 542. Moreover, to the extent that the requirements of the Act might impede a common-law right of action, a court "must exercise caution" to ensure that its interpretation is "no broader than the General Assembly intended." *Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. at 575-76.[6]

---

[6] In general, "statutes in derogation of the common law, such as the [Health Care Malpractice Claims Act], should be 'strictly construed' to avoid altering the common law beyond what is expressly stated in the statute." *Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. at 575 (quoting *Breslin v. Powell*, 421 Md. 266, 287 (2011)).

24

The first reported opinion to analyze the meaning of the statutory terms "related field of health care" and "related specialty" was *Jones v. Bagalkotakar*, 750 F. Supp. 2d 574 (D. Md. 2010). Although Maryland courts are not bound to follow opinions of federal trial courts, this Court has consistently treated the *Jones* opinion as persuasive authority concerning the interpretation and application of the Act. *See Nance v. Gordon*, 210 Md. App. 26, 37 (2013) (stating that this Court has "adopted significant portions of the reasoning" of the *Jones* opinion).[7]

In *Jones*, the court concluded that the text and history of the Act provided little insight into the meaning of the terms "related field of health care" or "related specialty." *Jones v. Bagalkotakar*, 750 F. Supp. 2d at 579-80. Seeking additional guidance, the court examined case law interpreting a similar requirement from a Virginia medical malpractice statute. *Id.* at 580-81 (discussing *Sami v. Varn*, 535 S.E.2d 172 (Va. 2000), and related cases).[8] Based on that analysis, the court derived the following standard: "If

[7] Shortly before the *Jones* opinion, this Court had decided *Powell v. Breslin*, 195 Md. App. 340 (2010). In that case, the circuit court had granted a motion for summary judgment after concluding that the certifying expert, an anesthesiologist, was not qualified to opine about the standard of care applicable to a vascular surgeon who had performed an arterial bypass procedure. *Id.* at 344-45. During a deposition, the certifying expert had "testified that he was unable to address the applicable standard of care for vascular surgeons[.]" *Id.* at 344. On appeal, the plaintiff conceded that the expert was unqualified but contended that the proper remedy was to dismiss the action without prejudice. *Id.* at 350. In light of that concession, neither this Court's opinion in *Powell v. Breslin*, nor the subsequent opinion in *Breslin v. Powell*, 421 Md. 266 (2011), addressed the merits of the ruling on the expert's qualifications.

[8] The relevant provision stated that an expert witness is qualified to testify about the standard of care if the witness "'demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standard'" and if the witness "'has had active clinical practice in either the defendant's

25

the procedure is one which both healthcare providers have experience with and the standard of care is purported to be similar, then the expert's qualifications satisfy the requirements of the Act." *Jones v. Bagalkotakar*, 750 F. Supp. 2d at 581. "However, if the procedure is one which the purported expert does not have experience or performs with a meaningfully different standard of care, then the expert does not qualify under the Act." *Id.*

Applying that standard, the court permitted a board-certified pediatrician to opine that a board-certified internist and emergency care doctor departed from the standard of care. *Jones v. Bagalkotakar*, 750 F. Supp. 2d at 582. The allegations of negligence in that case concerned the examination of an infant child at an emergency room for complaints of vomiting, diarrhea, and choking. *Id.* at 575-76. The court reasoned that both the defendant and the expert were "qualified by their specialties and training" to perform "the examination of a child who has fallen ill." *Id.* at 582. The court further reasoned that no party had argued that "the standard of care [was] strongly different" depending on which specialist performed the examination. *Id.*

This Court first addressed the meaning of the statutory term "related specialty" in *DeMuth v. Strong*, 205 Md. App. 521 (2012). In that case, we concluded that "the word 'related[,]'" as used in the Act, "embraces fields of health care and board certification specialties that, in the context of the treatment or procedure in a given case, overlap." *Id.*

---

specialty or a related field of medicine'" within one year of the conduct giving rise to the claim. *Jones v. Bagalkotakar*, 750 F. Supp. 2d at 580 (emphasis omitted) (quoting Va. Code § 8.01-581.20(A)).

at 544.  In other words, "specialties are 'related[]' when there is an overlap in treatment or procedures within the specialties and therefore an overlap of knowledge of treatment or procedures among those experienced in the fields or practicing in the specialties, and the treatment or procedure in which the overlap exists is at issue in the case."  *Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. 1, 18 (2012) (discussing *DeMuth*).  Distinct specialties may be related even "if they are regulated by different boards, require different training regimens, or concern different aspects of human anatomy or physiology."  *DeMuth v. Strong*, 205 Md. App. at 544.  "The critical aspect of the analysis is whether 'the standard of care for [the] treatment would not differ depending upon which specialist was the one to see the [patient] for treatment.'"  *Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. at 581 (quoting *DeMuth v. Strong*, 205 Md. App. at 544).

The defendant in the *DeMuth* case was a board-certified orthopedic surgeon who performed a knee replacement surgery.  *DeMuth v. Strong*, 205 Md. App. at 525-26.  Treating the patient for several days after the operation, the orthopedic surgeon failed to recognize that the patient was developing compartment syndrome, a condition involving loss of blood flow to an affected limb.  *Id.* at 526-29.  The trial court permitted a board-certified vascular surgeon to testify that the orthopedic surgeon departed from the standard of care during the postoperative period.  *Id.* at 530-32.  This Court upheld the admission of the expert testimony, concluding that, "in the context of the malpractice allegations in th[e] case, the specialties of orthopedic surgery and vascular surgery overlap[.]"  *Id.* at 545.

27

Explaining that conclusion, we observed that the expert "did not give and was not being asked to give standard of care testimony about the performance of the knee replacement surgery itself." *DeMuth v. Strong*, 205 Md. App. at 545. "Rather," we explained, "his opinions focused solely on the postoperative care and treatment of patients who have undergone that surgery." *Id.* We stated that both "[o]rthopedic and vascular surgeons are trained in how to examine a patient in the postoperative period" to assess whether the patient's limb has adequate blood flow. *Id.* at 546. Because "the central standard of care issue in th[e] case—the proper postoperative diagnosis and treatment of possible vascular complications of orthopedic surgery—implicated the 'overlap' between the specialties[,]" we concluded that "vascular surgery and orthopedic surgery were 'related specialt[ies]'" within the meaning of the Act. *Id.*

This Court applied the reasoning of *DeMuth* in *Nance v. Gordon*, 210 Md. App. 26 (2013). In that case, one defendant was a board-certified urologist (*id.* at 27) who had participated in diagnostic consultations about a teenage patient who sought emergency treatment for blood in his urine. *Id.* at 29. The purported expert, who was board-certified in pediatric nephrology, opined that the defendant violated the standard of care by failing to consider nephritis (inflammation of the kidneys) in a differential diagnosis of the patient's condition. *Id.* at 30. This Court concluded that, under the circumstances, the expert was qualified to testify concerning the standard of care. *Id.* at 45. We reasoned that both nephrologists and urologists perform the procedure at issue: "a differential diagnosis at the time the patient presents to the emergency room[.]" *Id.* at 41. In addition, we noted that the expert's testimony established that he had "personally

28

participated" in the same type of consultations that the defendant performed for the patient. *Id*.

On the other hand, in *Hinebaugh v. Garrett County Memorial Hospital*, 207 Md. App. 1 (2012), this Court recognized a distinction between certain "front line health care provider[s]" who make an initial examination of a patient and certain "specialist[s]" who typically provide treatment only after referral from another health care provider. *Id.* at 28. The defendants in the *Hinebaugh* case included a board-certified family medicine doctor, who examined a patient who had been punched in the face, and two board-certified radiologists, who examined X-rays of the patient's face. *Id.* at 6, 9. The patient filed a certificate of a qualified expert from a dentist with board certification in oral and maxillofacial surgery (OMS). *Id.* at 8, 10. The OMS expert opined that the defendants breached the standard of care by failing to perform a CT scan when diagnosing the injury. *Id.* at 25. In those circumstances, this Court determined that the expert did not satisfy the "related specialty" requirement. *Id.* at 29.

We explained that the family medicine doctor who examined the patient "was engaged in the family medicine practice of 'first-contact care,' that is, he was on the front line, assessing [the patient's] complaint of pain caused by having been hit in the face." *Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. at 25. The radiologists who "assess[ed] the results of . . . simple x-rays to determine whether they revealed any damage to the bones of [the patient's] face[] were practicing diagnostic radiology." *Id.* An affidavit from the OMS expert established that his "services as an OMS specialist primarily are sought out by doctors working on the front line once a facial fracture has

been diagnosed." *Id.* at 27. "At no place" in the affidavit did the OMS expert "attest to knowledge of the prevailing standard of care for family medicine doctors in diagnosing patients" seeking treatment for an injury to the face "or to knowledge of the prevailing standard of care for radiologists in reviewing simple x-rays taken of the injured area of such a patient." *Id.* at 28. The expert "d[id] not opine that the standard of care for either family medicine doctors or radiologists overlaps with that of an OMS specialist[.]" *Id.*

We stated that "the standard of care issue in th[e] case concern[ed] the alleged failure of a family medicine doctor and two radiologists to diagnose facial fractures upon initial presentation of a patient." *Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. at 28. Assessing the relatedness requirement "in that context[,]" we determined that "OMS is not a 'related specialty' to family medicine or radiology." *Id.* We explained:

> Any commonality between OMS and either family medicine or radiology with respect to the initial diagnosis of facial fractures does not exist on the same plane. OMS dentists are not front line health care providers. They are brought into a case upon referral or request of a front line health care provider, usually when a facial fracture diagnosis already has been made or sometimes when the involvement of a specialist in the diagnosis and treatment of facial fractures is needed. Family medicine doctors, radiologists, and OMS dentists all may examine and test patients for possible facial fractures, but they do not do so on an equal footing. Ordinarily, and it is the case with the defendants here, family medicine doctors and radiologists do so as part of a general practice in which they see for initial examination and testing a wide spectrum of patients. . . . OMS dentists examine and test patients as specialists whose area of practice only concerns facial fractures. Thus, the specialties do not overlap in that OMS dentists and family medicine and/or radiology doctors are not by education, training, experience, or competency on an equal footing with respect to the diagnosis and treatment of facial fractures in front line patients.

*Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. at 28-29.

This Court applied the "same reasoning" of *Hinebaugh* in *Street v. Upper*

30

*Chesapeake Medical Center, Inc.*, 260 Md. App. 636, 659 (2024). In that case, we upheld a ruling to preclude a board-certified vascular surgeon from testifying that a board-certified emergency medicine doctor breached the standard of care while examining a patient in an emergency room for complaints of foot numbness. *Id.* at 649-51. We stated that the defendant was "a front-line emergency medicine physician" making initial assessments of a wide spectrum of patients. *Id.* at 659. The purported expert was "a specialist in vascular surgery who sees patients already thought to have vascular disease, not patients presenting for an initial assessment of their systems." *Id*. We concluded that the case "lacked the overlap and symmetry in treatment present in those cases" in which the expert's specialty was sufficiently related to the defendant's specialty. *Id.*

### *Standard-of-Care Opinions from Dr. McAlary*

In the present case, the purported expert is not certified in the same specialty as the defendant. The defendant, Dr. Khan, is board-certified in gastroenterology, while the expert witness, Dr. McAlary, is board-certified in anesthesiology. The circuit court concluded that, in the context of this case, these two specialties were not "related" within the meaning of the Health Care Malpractice Claims Act. The court stated that "there [was] no 'overlap' as discussed in *DeMuth*, *Hinebaugh*[,] and *Jordan* between anesthesiology and gastroenterology[.]"

In this appeal, the plaintiffs argue that there is "an overlap between a gastroenterologist and anesthesiologist regarding fall risk assessments in the post-procedure discharge of a patient" after an endoscopy performed under anesthesia. The

31

plaintiffs assert that, like the expert who testified in *DeMuth*, Dr. McAlary was not offering opinions about the surgical procedure itself but only opinions "relate[d] to the post-procedure management" of Mr. Reid. The plaintiffs assert that, in their respective practices, both Dr. Khan, as a gastroenterologist, and Dr. McAlary, as an anesthesiologist, assess patients recovering after an endoscopy and make decisions concerning the discharge of the patient. According to the plaintiffs, there is "a complete overlap between the specialties" in this area of treatment, a "post-procedure assessment" performed by either specialist.

To determine whether the two specialties are sufficiently "'related'" within the meaning of the Act, this Court must examine "the context of the treatment or procedure" at issue. *DeMuth v. Strong*, 205 Md. App. 521, 544 (2012). The treatment or procedure at issue here is the discharge assessment of a patient who has undergone an upper endoscopy, performed by a gastroenterologist at an ambulatory surgery center, under anesthesia administered by an anesthetist. The alleged departures from the standard of care by Dr. Khan relate to that aspect of the medical care. The complaint alleged that Dr. Khan breached the applicable standard of care by failing to identify Mr. Reid as a fall risk and by discharging him without a wheelchair. In the report accompanying the certificate of a qualified expert, Dr. McAlary opined that Dr. Khan departed from the standard of care by "[p]ermitting Mr. Reid to leave the facility without wheelchair transport to his vehicle." Dr. McAlary wrote that, in his opinion, the standard of care required, "because of Mr. Reid's current history of morbid obesity, hypertension, diabetes mellitus, and [gastroesophageal reflux disease], . . . that Mr. Reid be transported to his vehicle via a

32

wheelchair."

In opposition to the summary judgment motion, the plaintiffs produced excerpts of deposition testimony in which Dr. McAlary discussed his practice as an anesthesiologist and its relationship to the practice of gastroenterology. Dr. McAlary explained that, throughout the previous five years, he provided anesthesia services at various ambulatory surgery facilities in Maryland and Virginia. Dr. McAlary stated that some of those facilities provide care for gastroenterology patients, that almost all of those facilities perform endoscopic procedures, and that one facility focuses exclusively on endoscopic procedures for gastroenterology patients. Dr. McAlary explained that, in an upper endoscopy, a gastroenterologist and anesthesiologist have some "common" roles and some "separate" roles. Counsel for Dr. Khan elicited the following testimony:

> [COUNSEL FOR DR. KHAN:] And we can agree that when you're working . . . at [an] ambulatory surgical center, even performing gastroenterology care, you're doing something different than the gastroenterologist is doing. And the gastroenterologist is doing something different than you're doing, correct?

> [DR. McALARY:] There would be overlap and there would be differences. Keeping an eye on patient monitors would be a shared responsibility. Deciding whether a lesion within the bowel required biopsy would be unique to the gastroenterologist.

Other documents in the record indicate that, at the BACE facility, the gastroenterologist and anesthetist shared certain responsibilities for overseeing the discharge of the patient after a procedure performed under sedation. The "Discharge Assessment" portion of the "Post Procedure Record" form included a line stating "[patient] ready for discharge (D/C) after assessment by physician/CRNA @" followed

33

by a blank space. This document indicates that, at the BACE facility, either the physician (Dr. Khan) or the certified registered nurse anesthetist (CRNA Sergott) or both were responsible for assessing the patient before discharge. As Nurse Dinisio explained at her deposition, BACE's policies generally required the physician to perform the discharge assessment and required the certified registered nurse anesthetist to perform the discharge assessment only if the physician was not present.

In opposition to the summary judgment motion, the plaintiffs relied on an affidavit in which Dr. McAlary stated that his opinions about Dr. Khan's departures from the standard of care "relate[d] to the postoperative management, care, and discharge" of Mr. Reid. Dr. McAlary further stated:

> The esophagogastroduodenscopy ("EGD") procedure Mr. Reid underwent on October 13, 2015, is a similar and common procedure for which both gastroenterologists, and anesthesiologists (working in the setting of an endoscopic ambulatory surgical center), have experience. In fact, the standard of care that would apply to a gastroenterologist, and an anesthesiologist, related to the postoperative management, care, and discharge of a patient who had undergone an EGD procedure under anesthesia, would be identical.

In our assessment, the summary judgment record adequately established that the allegations against Dr. Khan implicate an overlap between gastroenterology and anesthesiology. In the type of procedure performed on Mr. Reid, a gastroenterologist collaborates with an anesthesiologist (or anesthetist). Although some responsibilities are separate, the two types of specialists share some common responsibility for post-procedure care, such that either specialist should be equally capable of assessing how the patient should be discharged while recovering after the procedure.

34

The purported expert here, anesthesiologist Dr. McAlary, had extensive experience with the same type of procedure, performed in the same clinical setting, in a role analogous to the anesthetist at the BACE facility. According to Dr. McAlary, the standard of care "related to the postoperative management, care, and discharge of a patient who had undergone [this] procedure under anesthesia" would be the same for either specialist making the assessment. For purposes of the summary judgment motion, the court was required to accept as true the assertion that the standard of care was the same for a gastroenterologist and an anesthesiologist. *See Frankel v. Deane*, 480 Md. 682, 706 (2022) (holding that trial court erred by "improperly adopt[ing] the interpretation" of expert testimony that was "least favorable" to the patient when granting summary judgment in favor of defendant health care provider).[9]

The circuit court nevertheless concluded that Dr. McAlary was unqualified to testify about the standard of care for the post-procedure assessment performed by Dr. Khan. In explaining its conclusion, the court did not discuss whether Dr. McAlary has experience with the procedure or treatment at issue. Nor did the court acknowledge Dr. McAlary's assertion that the standard of care would be the same regardless of which specialist performed the discharge assessment. Instead, the court highlighted one distinction between the present case and *DeMuth v. Strong*, in which this Court held that an expert vascular surgeon could testify about the standard of care for postoperative

---

[9] Generally, disputes over the "nature and scope" of a standard of care are "within the province of the jury, not the court, to decide." *Crise v. Maryland Gen. Hosp., Inc.*, 212 Md. App. 492, 524 (2013).

management by an orthopedic surgeon. The court wrote that there was "no evidence of similar training" between the specialties in this case "as there [was] in *DeMuth* between vascular and orthopedic surgeons."

It is true that Dr. McAlary did not expressly state, either at his deposition or in his affidavit, that gastroenterologists receive similar training to anesthesiologists in the area of fall-risk assessments. The plaintiffs did not address that point until their motion for reconsideration. In a supplemental affidavit, Dr. McAlary stated that practitioners in "all specialties of medicine" receive training for fall-risk assessments and that this training is "independent of a medical professional's specialty or subspecialty." His statement might be read to imply that gastroenterologists receive training concerning fall risks.

In any event, neither *DeMuth* nor any other authority requires the plaintiff to produce "evidence of similar training" in order to establish a connection between two specialties. Any evidence of similar training should be considered in the analysis, but it has never been required in all cases. For example, in *Nance v. Gordon*, 210 Md. App. 26, 41 (2013), where this Court concluded that an expert nephrologist was qualified to opine about the standard of care applicable to a urologist making a differential diagnosis of a patient with blood in his urine, this Court made no mention of evidence of similar training between those two specialties.

The primary focus is not on whether training regimens overlap but on whether "there is an overlap in treatment or procedures within the specialties *and therefore* an overlap of knowledge of treatment or procedures among those experienced in the fields or practicing in the specialties[.]" *Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md.

36

App. 1, 18 (2012) (emphasis added). In other words, "'[i]f a procedure is common to two specialties, an inference of relation is created between the two specialties.'" *Nance v. Gordon*, 210 Md. App. at 37 (quoting *DeMuth v. Strong*, 205 Md. App. at 543). Two specialties are sufficiently "'related'" when "the treatment rendered is performed by both specialists and therefore is within the overlapping expertise of two board specialty areas, so that both board certified specialists should be equally knowledgeable and competent to testify about the prevailing standard of care for a health care provider board certified in either specialty[.]" *Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. at 23.

Dr. Khan maintains that the specialties of gastroenterology and anesthesiology do not overlap in the context of this case. In his appellate brief, Dr. Khan focuses on the following excerpt from Dr. McAlary's deposition testimony:

> [COUNSEL FOR DR. KHAN:] So as an anesthesiologist, is it fair to say that you have sort of specialized knowledge and training in assessing the use of certain anesthetic medications in assessing fall risk after the use of those medications?
>
> [DR. McALARY:] Indeed, that should be integral to the training of anybody who administers those drugs.

Based on that response, Dr. Khan characterizes Dr. McAlary as "a specialist in the assessment of . . . the effect of anesthesia on the fall risk of the patient following a medical procedure." Dr. Khan asserts: "As a board certified anesthesiologist, Dr. McAlary's education, training, and experience is specialized as it relates to the effects of anesthesia medication and potential fall risk." Dr. Khan argues that, because Dr. McAlary has "specialized knowledge about the effects of anesthesia medication and the assessment of fall risks as compared to physicians in other specialties[,]" it should follow

37

that Dr. McAlary "does not practice in a sufficiently 'related specialty'" to gastroenterology.

Dr. Khan's argument is unconvincing. In nearly every case in which two distinct specialties are "related," the expert will have some knowledge not shared by health care providers in the defendant's specialty. There is no serious question that the expert vascular surgeon in *DeMuth v. Strong*, 205 Md. App. at 530-31, had specialized knowledge concerning the vascular complications that the patient experienced after knee replacement surgery performed by the defendant orthopedic surgeon. There is no serious question that the expert pediatric nephrologist in *Nance v. Gordon*, 210 Md. App. at 30, had specialized knowledge concerning the kidney disease (nephritis) experienced by the teenage patient evaluated by the defendant urologist. Standing alone, specialized knowledge of the pertinent medical issue does not disqualify the expert from opining that another specialist departed from an applicable standard of care.[10]

Although Dr. McAlary admitted that he has "specialized knowledge and training" concerning the effects of anesthesia, Dr. McAlary did not state that his standard-of-care opinions relied on that specialized knowledge or training. Moments before the question

---

[10] A medical expert may tend to have more advanced knowledge of the pertinent medical issue where the expert testifies about causation as well as the standard of care. In the present case, the plaintiffs relied on Dr. McAlary to testify not only about alleged departures from the standard of care but also that those departures caused Mr. Reid's injuries. If Dr. McAlary lacked specialized knowledge of the effects of anesthesia, the defendants could have argued that he lacked sufficient expertise to opine about the cause of Mr. Reid's injuries. In fact, at trial, the defendants successfully moved to preclude another expert, Dr. Krasnow, from offering causation opinions, largely because he lacked knowledge, training, or experience concerning the effects of the anesthesia medication that was administered to Mr. Reid.

about his specialized knowledge, Dr. McAlary stated that "it should have been fairly obvious to any caregiver, primary or otherwise[,] that [Mr. Reid] was a fall risk, without having to perform any written assessment." Throughout his deposition, Dr. McAlary expressed his opinion that a "constellation" of "co-morbidities" (including advanced age, obesity, and diabetes) created the need to use a wheelchair. Dr. McAlary's opinion that Mr. Reid was a fall risk did not depend on the type of anesthesia medication used or the dosage. The only requisite knowledge of anesthesia was the basic knowledge that anesthesia medications "add to the risk of fall" in those patients who are already at risk.

In his brief, Dr. Khan argues that the present case is "precisely analogous" to *Hinebaugh*, in which this Court held that a dentist with board certification in oral and maxillofacial surgery (OMS) was not permitted to testify about the standard of care applicable to the board-certified family-medicine doctor who examined a patient with an injured face or to the board-certified radiologists who examined X-rays of the patient's face. This proposed analogy fails. The outcome of *Hinebaugh* follows from the difference between the care provided by certain "front line health care providers[,]" called upon to make an initial assessment, and the care provided by certain specialists, consulted after an initial diagnosis is made or suspected. *Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. at 28-29; *see also Street v. Upper Chesapeake Med. Ctr., Inc.*, 260 Md. App. 636, 655-56 (2024). "In the context of that case," the OMS expert and the defendants "necessarily operated under [] different standard[s] of care[.]" *Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. 555, 581 (2022).

The distinction between front-line health care providers and certain post-referral

39

specialists is inapplicable to the present case.  Anesthesiologists such as Dr. McAlary work side-by-side with gastroenterologists such as Dr. Khan.  The record established that, for the endoscopic procedure at issue, the gastroenterologist and the anesthesiologist (or anesthetist) share common responsibilities for ensuring the safe discharge of the patient. In this overlapping area of treatment, the two specialists were essentially "on an equal footing."  *Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. at 28.  Unlike the expert in *Hinebaugh*, who lacked any knowledge of the standard of care applicable to the defendants (*id.* at 27-28), Dr. McAlary affirmed that the relevant standard of care would be the same regardless of which specialist made the discharge assessment.  The record demonstrated "the overlap and symmetry in treatment" (*Street v. Upper Chesapeake Med. Ctr., Inc.*, 260 Md. App. at 659) needed to establish the connection between the two specialties, as well as an overlap in the standard of care.

### *Standard-of-Care Opinions from Dr. Krasnow*

In addition to challenging the court's determination that Dr. McAlary was unqualified to testify against Dr. Khan, the plaintiffs fault the court for failing to address the qualifications of a second potential standard-of-care expert, Dr. Krasnow.  A review of the record shows that the plaintiffs waived any contention that Dr. Krasnow was qualified to testify about the standard of care applicable to Dr. Khan.

In their response to the summary judgment motion, the plaintiffs presented no information and made no arguments whatsoever about the qualifications of Dr. Krasnow. Their response focused exclusively on the qualifications of Dr. McAlary as an anesthesiologist.  The plaintiffs stated that, because Dr. McAlary was qualified to testify

40

concerning the standard of care applicable to Dr. Khan, the court "need not address" the qualifications of Dr. Krasnow. The plaintiffs cannot be heard to complain that the court "ignored" Dr. Krasnow after the plaintiffs expressly asked the court to ignore Dr. Krasnow. *See Fox v. Fidelity First Home Mortg. Co.*, 223 Md. App. 492, 517-18 (2015) (holding that appellant failed to preserve ground for appellate review by failing to raise it in response to summary judgment motion).[11]

Even if the plaintiffs had relied on the qualifications of Dr. Krasnow when opposing the summary judgment motion, their argument would lack merit. The plaintiffs fail to explain the connection between gastroenterology and Dr. Krasnow's areas of board certification (internal medicine, hematology, and oncology). The plaintiffs presented no evidence that Dr. Krasnow, in his oncology practice, performs anything analogous to a post-procedure assessment of a patient after an endoscopy performed under general anesthesia at an ambulatory surgery center. Moreover, Dr. Krasnow did not attest to any familiarity with the standard of care applicable to a gastroenterologist in this clinical context. The only supposed connection that the plaintiffs identify is in the broad category of a "fall risk assessment" by "a clinician" of some kind. In other words, clinicians in many fields, from time to time, might need to consider whether a patient might be at risk

---

[11] The plaintiffs first argued that Dr. Krasnow was qualified to testify concerning the standard of care in their motion for reconsideration of the summary judgment ruling. The circuit court did not abuse its discretion when it denied the motion for reconsideration without expressly addressing the qualifications of Dr. Krasnow. *See Morton v. Schlotzhauer*, 449 Md. 217, 232 n.10 (2016) (stating that "[a] circuit court does not abuse its discretion when it declines to entertain a legal argument made for the first time in a motion for reconsideration that could have, and should have, been made earlier, and consequently was waived").

of falling down under various circumstances.  This purported commonality is not sufficient to establish the "overlap in treatment or procedures" (*Hinebaugh v. Garrett County Mem'l Hosp.*, 207 Md. App. 1, 18 (2012)) required under the Act.

### *Reversal of Summary Judgment Ruling*

As explained above, we conclude that the circuit court erred when it determined that Dr. McAlary was unqualified to provide expert opinion testimony concerning the standard of care applicable for Dr. Khan's post-procedure assessment of Mr. Reid.  The record here established that "the central standard of care issue in this case"—the discharge assessment of a patient after an upper endoscopy performed under anesthesia— "implicated [an] 'overlap' between the specialties" of gastroenterology and anesthesiology.  *DeMuth v. Strong*, 205 Md. App. 521, 546 (2012).  "[T]herefore, for purposes of that standard of care issue," gastroenterology and anesthesiology "were 'related specialt[ies]'" within the meaning of the Act.  *Id.*

Accordingly, we reverse the order granting summary judgment in favor of defendant Dr. Khan and defendant Jahangir Khan, M.D., LLC.

### II.    Jury Verdicts in Favor of CRNA Sergott and Nurse Dinisio

As discussed previously, after the circuit court granted Dr. Khan's motion for summary judgment, the case proceeded to a trial of the claims against CRNA Sergott, Nurse Dinisio, and BACE.  Based on the evidence presented, the jury found no violations of the applicable standards of care by either CRNA Sergott or Nurse Dinisio.

### *Likelihood of Prejudice from Summary Judgment Ruling*

In this appeal, the plaintiffs contend that, if this Court reverses the summary

judgment ruling in favor of Dr. Khan, this Court also must set aside the verdicts in favor of CRNA Sergott and Nurse Dinisio. The plaintiffs cite no authority holding that, when an appellate court reverses a summary judgment ruling in favor of one defendant, the court must order a new trial as to all other defendants who prevailed at a trial on the merits. We are aware of no principle that dictates an automatic reversal in these circumstances. *See Hoffman v. Stamper*, 385 Md. 1, 47 (2005) (explaining that "Maryland Rule 8-604(b) permits an appellate court, if it concludes that [an] error affects a severable part of the action, to reverse or modify the judgment as to that severable part, remand that part for further proceedings, and affirm the other parts of the judgment").

As the plaintiffs recognize, not every error justifies the grant of a new trial. When seeking to set aside a jury verdict in a civil case, the appellant must show not only that an error occurred but also that the error resulted in prejudice. *See, e.g.*, *Armacost v. Davis*, 462 Md. 504, 524 (2019). "Fundamentally," an appellate court's analysis of prejudice "focuses on whether an error undermines [its] faith in the jury's verdict." *American Radiology Servs., LLC v. Reiss*, 470 Md. 555, 589 (2020). The burden of showing prejudice "falls squarely on the complaining party." *Butler-Tulio v. Scroggins*, 139 Md. App. 122, 135 (2001). To justify reversal, the appellant ordinarily "must show that the error was so 'prejudicial' that it 'was likely to have affected the verdict[.]'" *Barbosa v. Osbourne*, 237 Md. App. 1, 20 (2018) (quoting *Flores v. Bell*, 398 Md. 27, 33 (2007)). In other words, the appellant "has the burden of demonstrating that prejudice was not just possible, but probable, in the context of the particular case." *Armacost v. Davis*, 462 Md. at 524.

It is not obvious how the summary judgment ruling in favor of Dr. Khan (or the exclusion of evidence that Dr. Khan departed from the standard of care) may have affected the verdicts in favor of either CRNA Sergott or Nurse Dinisio. In a trial against multiple defendants, the court instructs the jury that "[e]ach defendant is entitled to a fair and separate consideration of that defendant's own defense and is not to be affected by [the jury's] decision with respect to the other defendant[s]." Maryland Civil Pattern Jury Instruction (MPJI-Cv) 1:20(b). Correctly understood, the issue of whether Dr. Khan violated the applicable standard of care in his treatment of Mr. Reid was distinct from the issues of whether CRNA Sergott or Nurse Dinisio violated the applicable standards of care in their treatment of Mr. Reid. At trial, the plaintiffs had the opportunity to present any evidence that might prove that CRNA Sergott and Nurse Dinisio violated the applicable standards of care. Additional evidence of negligence by Dr. Khan would not, in any direct way, have advanced the plaintiffs' case against CRNA Sergott or Nurse Dinisio.

The plaintiffs nevertheless argue that the absence of Dr. Khan "tainted the proceedings" against the remaining defendants. The plaintiffs argue that, without evidence of Dr. Khan's negligence, they were "unable to combat" certain arguments made by CRNA Sergott and Nurse Dinisio. The plaintiffs cite the following remarks made during closing arguments:

> [COUNSEL FOR NURSE DINISIO:] [I]f everything their expert [Dr. McAlary] said is true, the policies and procedures, they all say it's Dr. Khan's responsibility. Dr. Khan never assessed him . . . as a fall risk. Dr. Khan never ordered a wheelchair. And he isn't here in Court.

44

And . . . we're not pointing the finger at anyone because every health care provider that's ever treated [Mr. Reid] was on the same page. We're not saying that Dr. Khan did anything wrong. We're saying that he did it right, because [Mr. Reid] wasn't a fall risk. . . .

Dr. Lippman, Plaintiffs' own orthopedic expert, said he wasn't a fall risk. [Mr. Reid's primary care physician] never said he was a fall risk. [Mr. Reid's endocrinologist] never said he was a fall risk. Dr. Khan never said he was a fall risk. CRNA Sergott never said he was a fall risk.

The plaintiffs also cite a later remark made by counsel for Nurse Dinisio: "And why is her following everyone else's orders and doing exactly what everyone else has done in the past, why does that make her negligent? It simply does not." In addition, the plaintiffs cite the following remark made by counsel for CRNA Sergott: "Dr. Khan assessed him for discharge. Dr. Khan did not consider him to be a fall risk. And Dr. Khan, who wrote the discharge order, did not order that he go out in the wheelchair."

According to the plaintiffs, these remarks demonstrate that CRNA Sergott and Nurse Dinisio "boostrap[ped] on the lack of evidence regarding Dr. Khan's negligence." We disagree with this characterization. A recurring theme of the quoted remarks was the theory (echoed throughout the arguments by all defendants) that Mr. Reid was not, in fact, a fall risk and thus that no one needed to provide him with a wheelchair. The quoted remarks pointed out that Dr. Khan did not order a wheelchair to show that Dr. Khan evidently agreed that Mr. Reid was not a fall risk. These remarks are insufficient to demonstrate that the lack of evidence of Dr. Khan's negligence probably affected the jury's determination of the claims against CRNA Sergott or Nurse Dinisio.

If the case had proceeded to trial against all defendants (including Dr. Khan), the evidence and arguments concerning CRNA Sergott and Nurse Dinisio would have been

45

nearly identical to what the jury already considered.  In that scenario, the jury would have received additional information about the care provided by Dr. Khan and competing expert opinions about whether he complied with the standards of care applicable to him. With or without the additional evidence, the jury still would need to make individualized determinations of whether the plaintiffs proved by a preponderance of the evidence that CRNA Sergott or Nurse Diniso violated the applicable standards of care.  In all likelihood, additional evidence about Dr. Khan's alleged negligence would have had minimal effect on the jury's consideration of the claims against CRNA Sergott or Nurse Dinisio.

### *Likelihood of Prejudice from Other Rulings at Trial*

In addition to arguing that reversal of the summary judgment ruling requires a new trial as to all defendants, the plaintiffs contend that the circuit court made other reversible errors at trial.  The plaintiffs take issue with the court's rulings precluding certain expert testimony about the cause of Mr. Reid's fall, precluding certain expert testimony about the adequacy of BACE's policies, omitting from the verdict sheet a question about negligence of BACE, and allowing the jury to consider the issue of contributory negligence.  For the remainder of this part of the Discussion, we will assume, without deciding, that the court erred in each of these rulings.  Operating under that assumption, we see no substantial likelihood that any of these purported errors affected the jury verdicts in favor of CRNA Sergott or Nurse Dinisio.

The first purported error concerns the court's decision to limit the scope of expert testimony from Dr. Krasnow.  At trial, the plaintiffs offered Dr. Krasnow as an expert in

46

internal medicine and emphasized that he would not address any standard-of-care issues. After an extensive inquiry into his knowledge and experience, the court prohibited Dr. Krasnow from opining that anesthesia probably caused Mr. Reid's blood pressure to decline or that the decline in blood pressure probably caused his fall. On appeal, the plaintiffs contend that the trial court's ruling improperly precluded them from introducing evidence of the causation element of their negligence claims.

We agree with the defendants that the exclusion of expert opinions about causation could not have affected the jury verdicts in favor of CRNA Sergott or Nurse Dinisio. The special verdict sheet required the jury to consider the issues of a breach of the standard of care separately from the issues of whether any breach caused Mr. Reid's injury. The jury answered "No" to the questions asking whether CRNA Sergott or Nurse Dinisio breached the standard of care in their treatment of Mr. Reid. Consequently, the jury did not answer the additional questions asking whether any breach "caused [Mr. Reid] to fall outside BACE, causing him injury, after he was discharged[.]"

The proffered opinion testimony from Dr. Krasnow concerned the cause of Mr. Reid's injuries, not whether any health care provider breached a standard of care. The admission or exclusion of the testimony, therefore, would not have affected the determination of whether CRNA Sergott or Nurse Dinisio breached their applicable standards of care. *Cf. Livingstone v. Greater Washington Anesthesiology & Pain Consultants, P.C.*, 187 Md. App. 346, 359 (2009) (concluding that plaintiffs sustained no prejudice from trial court's failure to instruct jury about substantial factor test for causation where jury found no breach of standard of care by defendant physicians and

47

thus "did not reach the issue of causation").[12]

The plaintiffs argue that the exclusion of Dr. Krasnow's causation opinions could not be harmless because the court's instructions to the jury "linked" the issue of breach of standard of care with the issue of causation. This argument is devoid of merit. The court provided appropriate explanations of the elements of a medical negligence claim (based on MPJI-Cv 27:1), the standard of care for a health care provider (based on MPJI-Cv 27:2), and the element of causation (based on MPJI-Cv 19:10). No juror would reasonably interpret those instructions to mean that proving a breach of the standard of care required proof of causation.

The second purported error concerns the exclusion of expert opinion testimony from Dr. McAlary. During redirect examination, the court sustained an objection to a question asking Dr. McAlary to explain an earlier statement in which he indicated his disagreement with "policies" of BACE. In their appellate brief, the plaintiffs assert that the purpose of this question was "to elicit testimony that [Dr. McAlary] believed [that] BACE had independent negligence" and that certain BACE policies "breached the standard of care[.]" The plaintiffs complain that, because they lacked expert testimony on that issue, the court withheld a question "about the independent negligen[ce] of BACE" from the verdict sheet.

---

[12] BACE observes that, although the court precluded Dr. Krasnow from testifying about the cause of Mr. Reid's fall, the court admitted expert testimony on causation from another expert, Dr. McAlary. The cumulative nature of the excluded testimony strengthens the conclusion that the ruling caused no substantial prejudice. *See Myers v. Estate of Alessi*, 80 Md. App. 124, 140 (1989).

48

Because the plaintiffs made no proffer of the excluded testimony, there is no basis to conclude that the testimony might have helped prove that either CRNA Sergott or Nurse Dinisio breached an applicable standard of care. *See Univ. of Maryland Med. Sys. Corp. v. Waldt*, 411 Md. 207, 235 (2009). The plaintiffs have identified no evidence establishing that either CRNA Sergott or Nurse Dinisio had authority or control over any purportedly insufficient policies. It is difficult to imagine how testimony criticizing BACE's policies might have affected the jury's consideration of the claims against CRNA Sergott or Nurse Dinisio. They were not the targets of this line of questioning. As the plaintiffs acknowledge, the "intention" of their proposed redirect examination was to generate a theory of "independent negligence" by BACE, as an additional basis for liability of that defendant. The plaintiffs have failed to establish that the exclusion of this testimony might have influenced the verdicts in favor of CRNA Sergott or Nurse Dinisio.

The third purported error concerns the omission of defendant BACE from the verdict sheet. During trial, counsel for BACE conceded that CRNA Sergott and Nurse Dinisio acted as employees or agents of BACE. Based on that concession, the court instructed the jury that BACE was liable for injuries or damages caused by the negligence of CRNA Sergott or Nurse Dinisio. The court did not include any separate questions on the verdict sheet asking the jury to decide whether CRNA Sergott and Nurse Dinisio acted as employees or agents of BACE.

We see no likelihood that omitting questions about agency from the verdict sheet may have affected the verdicts in favor of CRNA Sergott or Nurse Dinisio. An agency relationship was not an element of the claims against CRNA Sergott or Nurse Dinisio.

49

The question of whether they acted as employees or agents was material only to the determination of whether BACE might be vicariously liable for damages caused by their negligence. If the court had included questions about agency on the verdict sheet, as the plaintiffs suggest, the jury never would have reached those questions. Because the jury found no breach of the standard of care, the jury could not hold either of them liable, nor could it hold BACE vicariously liable for negligence not found to occur. *See Retina Grp. of Washington, P.C. v. Crosetto*, 237 Md. App. 150, 176-77 (2018).

The fourth purported error concerns the court's decisions to instruct the jury on the issue of contributory negligence and to include a question about contributory negligence on the verdict sheet. The plaintiffs contend that the evidence did not properly support any defense of contributory negligence and that the court erred by submitting that issue to the jury. Ultimately, however, the jury never decided that issue. The directions on the verdict sheet stated that, if the jury answered "No" to the questions asking whether CRNA Sergott or Nurse Dinisio breached the standard of care, the jury should not answer the question about contributory negligence. Because the jury found no breach of the standards of care by CRNA Sergott or Nurse Dinisio, the jury did not answer the later question asking whether Mr. Reid's "own negligence contributed to his fall outside BACE[.]"

In some circumstances, purported errors concerning a jury's consideration of contributory negligence may be rendered harmless if the jury considers that issue separately from other issues and if the jury finds no primary negligence. For example, in *Landon v. Zorn*, 389 Md. 206, 225-26 (2005), the Court concluded that the plaintiffs

50

sustained no prejudice from the trial court's refusal to give a custom instruction concerning the proof of contributory negligence in a medical malpractice case. The Court observed that, because the jury found no breach of the standard of care by the defendant physician, the jury did not reach the later question regarding contributory negligence. *Id.* at 228. For that reason, the plaintiffs "c[ould] show no prejudice as a result of the court's refusal to give the requested instruction." *Id.* Similarly, in *Consolidated Waste Industries, Inc. v. Standard Equipment Co.*, 421 Md. 201, 226 (2011), the Court concluded that the plaintiff sustained no prejudice from a purported error in including a contributory negligence question on the verdict sheet. The Court explained that the jury never decided the question of contributory negligence because it found no negligence and no resulting damages. *Id.*

The plaintiffs nevertheless contend that, in the circumstances of this case, submitting the issue of contributory negligence to the jury amounted to prejudicial error. In support of that contention, the plaintiffs attempt to analogize this case to *Barbosa v. Osbourne*, 237 Md. App. 1 (2018).

In *Barbosa v. Osbourne*, 237 Md. App. at 3, plaintiffs alleged that a surgeon negligently cut a patient's bile duct during an operation to remove an inflamed gallbladder. The surgeon invoked a defense of contributory negligence, based on allegations that the patient had delayed seeking treatment for his abdominal pain and that this delay complicated the surgery. *Id.* at 6. The court denied a pretrial motion to prohibit the surgeon from claiming that the patient's delay in seeking treatment amounted to contributory negligence. *Id.* at 7. Throughout the trial, the surgeon "vigorously

51

pursued a contributory negligence defense[,]" by raising that defense in opening statement, cross-examining witnesses on that issue, presenting testimony about the alleged contributory negligence from three medical experts, and raising that defense in closing arguments. *Id.* The jury found no violation of the standard of care by the surgeon and thus did not answer the question on the verdict sheet concerning contributory negligence. *Id.* at 8.

On appeal, this Court adopted the rule that "the purported negligence of a patient plaintiff, which precedes any medical treatment," may not "be raised as a defense of contributory negligence[] by a physician [who] subsequently treats that [patient][.]" *Barbosa v. Osbourne*, 237 Md. App. at 13. Accordingly, we determined that the trial court "committed multiple errors" by "permitting [the surgeon] to raise the issue of [the patient's] purported negligent delay in seeking treatment at every stage of the trial," by instructing the jury that the patient's pre-treatment negligence was a defense, and by "providing the jury with a special verdict sheet reiterating that instruction[.]" *Id.* at 19-20.

For "two independent but factually-related reasons[,]" we concluded that these errors probably influenced the verdict concerning a breach of the standard of care. *Barbosa v. Osbourne*, 237 Md. App. at 20. "The first reason[,]" we stated, was "the repeated invocation, by the defense, of [the patient's] alleged negligence in failing to seek immediate treatment that pervaded every aspect of the trial below." *Id.* "The second reason" was that "the defense relentlessly blended the two issues" of the patient's alleged negligence and the surgeon's alleged negligence, by urging the jury to consider the

patient's pre-treatment conduct before deciding whether the surgeon was negligent. *Id.* at 21-22. "The defense thereby invited the jury to consider [the patient's] negligence in deciding the very first question of the special verdict form, namely, whether [the surgeon] had deviated from the standard of care." *Id.* at 22.

The two reasons that supported the determination of prejudice in *Barbosa* are absent from this case. Here, the issue of contributory negligence did not "pervade[] every aspect of the trial" (*Barbosa v. Osbourne*, 237 Md. App. at 20), to such a degree that it affected the assessment of the standard of care. The defendants here did not "blend[]" (*id.* at 21) the issue of Mr. Reid's alleged negligence with the issues of whether CRNA Sergott and Nurse Dinisio violated the standard of care.

In this case, the defendants' theory of contributory negligence was little more than an alternative explanation for the cause for Mr. Reid's fall, mutually exclusive of the plaintiffs' explanation. As counsel for BACE phrased it during opening statements, the defendants argued that Mr. Reid simply "tripped and fell[]" and "it had nothing to do with the procedure or the anesthesia." Evidence tending to show that Mr. Reid tripped was still relevant to causation, regardless of whether that evidence generated a defense of contributory negligence. The court's eventual rulings on the issue of contributory negligence (which occurred after the presentation of evidence) did not affect the scope of any evidence presented to the jury. The defendants' expert witnesses did not rely on any information about Mr. Reid's conduct after he left the facility when they opined that CRNA Sergott and Nurse Dinisio provided adequate treatment at the facility. Under the circumstances, there was no risk of the type of prejudice described in *Barbosa*—that the

jury might have considered Mr. Reid's alleged negligence when deciding whether CRNA Sergott or Nurse Dinisio violated the standards of care.

*Affirmance of Judgments in Favor of CRNA Sergott and Nurse Dinisio*

In sum, we conclude that neither the error in granting Dr. Khan's motion for summary judgment nor the other alleged trial errors justify overturning the verdicts in favor of CRNA Sergott or Nurse Dinisio. These challenged rulings pertain to matters unconnected to the factual questions of whether CRNA Sergott or Nurse Dinisio breached the applicable standards of care: Dr. Khan's alleged negligence; proof of causation; alleged independent negligence by BACE; vicarious liability of BACE; and alleged post-treatment contributory negligence by Mr. Reid. The plaintiffs have failed to show a likelihood that errors or alleged errors, alone or in combination, affected the jury's determination that the plaintiffs failed to meet their burden of proving that CRNA Sergott or Nurse Dinisio breached the applicable standards of care.

Accordingly, the judgment is affirmed with respect to the claims against CRNA Sergott and Nurse Dinisio. The judgment is also affirmed with respect to claims that BACE is vicariously liable for alleged negligence of CRNA Sergott or Nurse Dinisio.

### III.   Judgment in Favor of Defendant BACE

In Part I of this Discussion, we concluded that the circuit court erred when it granted summary judgment in favor of Dr. Khan and Jahangir Khan, M.D., LLC. In Part II, we concluded that the plaintiffs failed to demonstrate any ground for reversing the judgment to the extent that it was based on the jury verdicts in favor of CRNA Sergott and Nurse Dinisio.

54

The remaining defendant, BACE, is not similarly situated with CRNA Sergott or Nurse Dinisio. The complaint alleged that, at the time of the alleged negligence, Dr. Khan and Jahangir Khan, M.D., LLC, acted as employees or agents of BACE. As a result of the summary judgment ruling, the court never adjudicated the issue of whether an agency relationship exists between those defendants and BACE.

In its appellate brief, BACE concedes that, if this Court reverses the summary judgment ruling, this Court must vacate the judgment with respect to claims that BACE is vicariously liable for alleged negligence of Dr. Khan and Jahangir Khan, M.D., LLC. In light of that concession, the judgment in favor of BACE cannot stand. The plaintiffs are entitled to a new trial of claims against BACE along with the trial of their claims against Dr. Khan and Jahangir Khan, M.D., LLC. We will discuss the remaining issues raised in this appeal because those issues might recur at a second trial and because the resolution of those issues might affect the scope of the issues at a second trial.

## *Causation Testimony from Dr. Krasnow*

The plaintiffs contend that the circuit court abused its discretion when it precluded one expert witness, Dr. Krasnow, from opining that anesthesia caused Mr. Reid's blood pressure to decline and that the decline in blood pressure caused him to fall outside of the BACE facility. We perceive no abuse of discretion in the court's ruling.

The plaintiffs offered Dr. Krasnow as an expert in the field of "[i]nternal medicine only." During direct examination, counsel for the plaintiffs asked Dr. Krasnow to explain why Mr. Reid's blood pressure readings after the procedure were lower than his pre-procedure readings and "trend[ing] downward." All defendants objected, arguing that

Dr. Krasnow was not properly qualified to give expert opinions on that subject. The defendants observed that Dr. Krasnow does not administer anesthesia medications in his practice and that he does not evaluate patients after sedation.

With the court's permission, counsel for the plaintiffs questioned Dr. Krasnow extensively about his education, knowledge, and experience. Dr. Krasnow explained that, in his oncology practice, he regularly provides patients with long-acting painkillers, including narcotic analgesics (such as morphine) and benzodiazepines (such as Valium). Dr. Krasnow stated that lowering a person's blood pressure is "one of the side effects" of narcotic analgesics. Dr. Krasnow claimed to have some familiarity with Propofol but said that he had not researched any medical literature about Propofol when rendering his opinions. Dr. Krasnow stated that Propofol is "very similar to opioids in most respects," but that it exerts its effects through a different brain receptor "than what classical opioid drugs work on." Dr. Krasnow also stated that Propofol exerts its effects through the same brain receptors as benzodiazepines. Dr. Krasnow explained that he does not use Propofol in his practice because it is a short-acting sedative, approved only for use as anesthesia.

Based on that testimony, the court precluded Dr. Krasnow from offering opinions, to a reasonable degree of medical certainty, on whether Propofol caused Mr. Reid's blood pressure to decline or whether the decline in blood pressure caused him to fall. The court gave the following explanation for its ruling:

> [THE COURT:] . . . I am not going to let him testify to the fall being caused by the Propofol. . . . . For a myriad of reasons. He does not do post-op care, he does not use Propofol, he cited no medical literature to support that type of conclusion, he has no experience in it, he does not do drugs by infusion which was done here. He made the statement that short

56

acting drugs wear off almost as soon as you stop using them. . . . His experience is all with long-acting drugs. Additionally, I don't think we have any basis to connect this fall to anything he has said. So, . . . I'm not going to let that question come in. I'm not going to strike his testimony thus far either.

Although the court sustained the defendants' objection, the court permitted Dr. Krasnow to testify, in general terms, that Propofol "can" lower a person's blood pressure. Dr. Krasnow later stated, without objection, that a decrease in blood pressure can make a person dizzy or less alert and limit the person's ability to function. On this record, we see no abuse of discretion.

"Any witness who testifies as an expert . . . must have sufficient knowledge, skill, and experience to make a well-informed opinion." *Smith v. Pearre*, 96 Md. App. 376, 396 (1993). When deciding whether to admit expert testimony, the court must determine: "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." Md. Rule 5-702. Contrary to the plaintiffs' arguments, not every challenge to the basis for expert testimony strictly concerns the weight of the testimony rather than its admissibility. *See Katz, Abosch, Windesheim, Gershman & Freedman, P.A. v. Parkway Neuroscience & Spine Inst.*, 485 Md. 355, 372, 380 (2023). Although it is not always necessary for an expert to have personal experience with the medical issues in question, an opinion on medical causation should not be admitted unless it is shown to be based on reliable information and a reliable methodology. *See Roy v. Dackman*, 445 Md. 23, 41-43 (2015). Trial courts have "'broad latitude'" in determining whether expert testimony

57

meets this threshold of reliability. *Katz, Abosch, Windesheim, Gershman & Freedman, P.A. v. Parkway Neuroscience & Spine Inst.*, 485 Md. at 361 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999)).

The circuit court acted within its discretion when it determined that the plaintiffs failed to establish a sufficient basis for Dr. Krasnow to opine that Propofol caused Mr. Reid's fall. The shortcoming was not simply that Dr. Krasnow lacked first-hand experience with Propofol or other short-acting anesthetic drugs. The testimony failed to establish that Dr. Krasnow had the requisite knowledge, gained from any source, about the probable effects of Propofol on a person's blood pressure. Dr. Krasnow did not, for instance, testify that he learned through education, training, study, or research that Propofol has been shown to reduce blood pressure in some percentage of patients for some duration. At best, Dr. Krasnow's testimony established that he knew that Propofol has many similarities (but also some important differences) with certain painkillers known to have the side effect of causing a person's blood pressure to decline. The testimony elicited by the plaintiffs did not support the specific opinions proffered: that Propofol probably caused Mr. Reid's blood pressure to decline and that the decline in blood pressure probably caused his fall.

### *Opinion Testimony about BACE's Policies*

The plaintiffs contend that the circuit court erred by precluding Dr. McAlary from offering opinions about the adequacy of "policies" of BACE. Although the plaintiffs broadly accuse the court of "muzzling" their presentation of evidence concerning BACE's policies, their appellate brief mentions only one actual evidentiary ruling made

during Dr. McAlary's testimony.

Testifying as an expert in anesthesiology, Dr. McAlary expressed his opinions that CRNA Sergott and Nurse Dinisio violated the applicable standards of care by failing to identify Mr. Reid as a fall risk and by failing to ensure that he would be discharged by wheelchair. Shortly before the end of cross-examination, counsel for BACE asked: "You disagree with the policies of BACE?" Dr. McAlary answered: "Well, yes, I disagree with the policy, but that's a whole separate issue."

During redirect examination, counsel for the plaintiffs posed the following question to Dr. McAlary: "You . . . indicated earlier that you thought that . . . the BACE policies were insufficient[.] [W]hat did you mean by that?" Counsel for BACE made a general objection, and the court sustained the objection. In a bench conference that followed, counsel for BACE asserted that Dr. McAlary had "never testified . . . that the BACE policies were insufficient" when asked during his deposition to disclose his standard-of-care opinions. Counsel for the plaintiffs argued that the defendants had "opened the door" to testimony about BACE's policies by mentioning certain policies during cross-examination. BACE continued to object on the grounds of what Dr. McAlary said or did not say in discovery.

Ultimately, the court did not rule on the alleged discovery violation. Before any ruling on that subject, counsel for the plaintiffs asked the court to decide a narrower issue of whether Dr. McAlary could opine that CRNA Sergott breached the standard of care by failing to advise Nurse Dinisio that Mr. Reid needed a wheelchair. Over the defendants' objections, the court permitted the plaintiffs to elicit that opinion from Dr. McAlary.

59

Counsel for the plaintiffs abandoned the earlier line of questioning about BACE's purportedly "insufficient" policies.

In their appellate brief, the plaintiffs assert that the purpose of their question to Dr. McAlary was "to elicit testimony that he believed BACE had independent negligence as their policies/procedures breached the standard of care to a reasonable degree of medical certainty." If this assertion is true, we see no reason why the plaintiffs could not have explored that issue on direct examination rather than waiting until redirect examination. Generally, trial courts have wide discretion to control the scope of redirect examination. *See Feeney v. Dolan*, 35 Md. App. 538, 548 (1977). When the court sustained the objection, the court reasonably could have concluded that redirect examination was not the appropriate time for the plaintiffs to introduce a new theory of a defendant's breach of the standard of care.[13]

In any event, even if the court was required to permit the plaintiffs to use their redirect examination to explore a new theory of medical negligence, the record still is inadequate to evaluate any alleged error. "Error may not be predicated upon a ruling that . . . excludes evidence unless the party is prejudiced by the ruling, and . . . the substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered." Md. Rule 5-103(a)(2). Under this Rule, an appellant must make a proffer of the substance of the excluded evidence in order

_____

[13] Moreover, the court could have concluded that the wording of the question was improper. Dr. McAlary had testified that he "disagree[d]" with a BACE "policy," but counsel for the plaintiffs claimed that he had "indicated" that he believed that BACE's policies were "insufficient[.]"

to obtain appellate review of a contention that the trial court erred by excluding that evidence. *See Univ. of Maryland Med. Sys. Corp. v. Waldt*, 411 Md. 207, 235 (2009). "Without a proffer, it is impossible for appellate courts to determine whether there was prejudicial error or not." *Id.* An appellant's failure to make a proffer of the substance of the excluded testimony ordinarily precludes appellate review of a ruling to exclude that testimony. *See Keefover v. Giant Food, Inc.*, 83 Md. App. 306, 314 (1990).

At trial, the plaintiffs made no proffer of what Dr. McAlary might have said in response to the question about what he meant when he "indicated" that BACE's policies were "insufficient[.]" The substance of his response was not apparent from the context. Neither Dr. McAlary's statement that he "disagree[d]" with a "policy" of BACE nor the question asked during redirect examination mentioned or alluded to a specific policy or policies. BACE's written policies were extensive. Excerpts admitted into evidence from the BACE policy manual (such as "20.4 Discharge Phase" or "23 Administration of Anesthesia") span multiple pages and address various aspects of post-anesthesia care. Because the record does not include sufficient information about the nature or extent of Dr. McAlary's possible standard-of-care criticisms, it is insufficient for appellate review of the evidentiary ruling. *See Univ. of Maryland Med. Sys. Corp. v. Waldt*, 411 Md. at 235-36.

In their brief, the plaintiffs suggest that this Court can infer the substance of Dr. McAlary's opinions about BACE's policies. The plaintiffs note that, during an earlier series of questions, Dr. McAlary had stated that he would offer opinions to a reasonable degree of medical certainty unless he indicated otherwise. Based on that statement, the

61

plaintiffs argue that, "when Dr. McAlary indicated that he disagreed with BACE's policies and that they were not correct, he was clearly indicating that they breached the standard of care[.]"

The plaintiffs' proposed inference is unreasonable. When Dr. McAlary expressed his "disagree[ment]" with some unidentified "policy," he immediately differentiated that statement from his other opinions by adding that his disagreement was "a whole separate issue." His testimony cannot be fairly interpreted as any definite opinion on any standard-of-care-issues. It is not uncommon for medical experts to state that they disagree with a decision, or that they personally would have made a different decision, without going so far as to say that the decision violates the prevailing standard of care. Expert testimony that merely criticizes some aspect of medical treatment is not equivalent to an opinion that the treatment violated the standard of care. *See Retina Grp. v. Washington, P.C. v. Crosetto*, 237 Md. App. 150, 176 (2018) (holding that an "off-hand response" in which an expert "criticized" a treatment decision did not amount to an opinion that the treating physician departed from the standard of care); *Ramsey v. Physicians Mem'l Hosp., Inc.*, 36 Md. App. 42, 49 (1977) (holding that expert's testimony that "he personally would have" taken a particular action did not amount to testimony that the failure to take that action "was violative of the minimal standard of care").

### Omission of Questions about Agency from Verdict Sheet

The plaintiffs contend that the circuit court erred by failing to include questions on the verdict sheet asking whether CRNA Sergott and Nurse Dinisio acted as agents of

62

BACE. The plaintiffs' contention is not properly preserved.

During trial, counsel for BACE stipulated that CRNA Sergott and Nurse Dinisio acted as employees or agents of BACE and that BACE was vicariously liable for negligence of either CRNA Sergott or Nurse Dinisio. Later, during discussions about the content of the verdict sheet, counsel for the plaintiffs asserted that they were "free to reject that stipulation." The court asked counsel for the plaintiffs whether they were requesting, for example, "an actual question on the verdict sheet" asking whether Nurse Dinisio was an agent or employee of BACE.

In response, counsel for the plaintiffs requested "the scope of employment language" from the verdict sheets used in *Reiss v. American Radiology Services, LLC*, 241 Md. App. 316 (2019), *aff'd*, 470 Md. 555 (2020). The verdict sheets used in that case did not include separate questions asking whether the defendant physicians acted as employees of a defendant professional association. *Id.* at 343-48. Rather, the verdict sheets inserted a modifying clause—"acting in [the physician's] capacity as an employee of [the professional association]"—within the questions asking whether the physicians breached the standard of care. *Id.* at 343, 345, 347.

Seeking clarification, the circuit court asked counsel for the plaintiffs to confirm that they were requesting language such as: "was Gary Sergott . . ., comma, acting in his capacity as an agent for the Baltimore Ambulatory Center for Endoscopy, comma, negligent in the care of Carroll Reid." Counsel responded that the plaintiffs were requesting "the instruction that was in [*Reiss*] for both [d]efendants."

On appeal, the plaintiffs fault the court for failing to include what they call "the

63

question of agency" on the verdict sheet. The plaintiffs argue that, despite the stipulation from BACE, the court was required to submit the "question of agency . . . to the jury" because it was "a factual matter" for the jury to decide. Under the circumstances, the contention that the court erred by failing to include questions on the verdict sheet concerning whether CRNA Sergott and Nurse Dinisio acted as agents of BACE is not properly preserved. *See* Md. Rule 2-522(b)(5) (stating that "[n]o party may assign as error . . . the refusal of the court to submit a requested issue unless the party objects on the record before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection").

Counsel for the plaintiffs did not request *questions* about agency on the verdict sheet. Counsel requested certain "scope of employment language" within the questions asking about whether CRNA Sergott and Nurse Dinisio breached the applicable standards of care. The court twice sought clarification, asking the plaintiffs whether they were requesting stand-alone questions about agency or merely modifying clauses that would presuppose the existence of an agency relationship. In response, counsel did not request any particular questions about agency on the verdict sheet. On this record, the plaintiffs are deemed to have waived any contention that the court erred by failing to submit questions concerning the issue of agency to the jury. *See Selective Way Ins. Co. v. Nationwide Prop. & Cas. Ins. Co.*, 242 Md. App. 688, 740 (2019) (citing *Weichert Co. of Maryland, Inc. v. Faust*, 419 Md. 306, 316 n.1 (2011)).[14]

---

[14] Ultimately, the verdict sheet did not include clauses referring to BACE within the questions about the alleged negligence of CRNA Sergott and Nurse Dinisio. The

*Availability of Contributory Negligence Defense*

Of all the issues raised in this appeal, the one issue that almost certainly will arise at a second trial is the issue of contributory negligence. This Court reviews without deference the circuit court's determination that the evidence was sufficient to establish a defense of contributory negligence. *See Barbosa v. Osbourne*, 237 Md. App. 1, 9 (2018).

Under Maryland law, "the doctrine of contributory negligence bars a plaintiff's recovery against a defendant who causes an injury where [the] injury is also a result of the plaintiff's own failure to exercise due care." *Kiriakos v. Phillips*, 448 Md. 440, 474 n.38 (2016) (citing *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 687 (2013)). Contributory negligence is an affirmative defense, and the defendant bears the burden of production for each element of the defense. *See Rosenthal v. Mueller*, 124 Md. App. 170, 173-74 (1998). Although even "'meager evidence'" may be enough to generate a factual question of contributory negligence, a defendant "'cannot sustain this burden by offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture that [the] other party has been guilty of negligence[.]'" *Id.* at 174 (quoting *Fowler v. Smith*, 240 Md. 240, 246-47 (1965)).

To prove that a patient was contributorily negligent, a defendant health care provider must prove that the patient's conduct "'f[ell] below the standard to which [a patient] should conform for [the patient's] own protection'" and that the conduct was "'a

plaintiffs have not specifically challenged that aspect of the verdict sheet. Moreover, the plaintiffs have cited no authority that might have required those questions to include modifying clauses mentioning the stipulated agency relationship.

legally contributing cause co-operating with the negligence of the defendant in bringing about the [patient's] harm.'" *Kassama v. Magat*, 368 Md. 113, 127 (2002) (quoting *Craig v. Greenbelt Consumer Servs., Inc.*, 244 Md. 95, 97 (1966)) (further citation omitted); *see also DiLeo v. Nugent*, 88 Md. App. 59, 72-73 (1991). In assessing a patient's conduct, "'the standard of care to be used as the criterion is that of an ordinarily prudent person under the same or similar circumstances, not that of a very cautious person.'" *Moodie v. Santoni*, 292 Md. 582, 586-87 (1982) (quoting *Menish v. Pollinger Co.*, 277 Md. 553, 559 (1976)). Even if the act done by the patient "'turns out to be an error of judgment, this alone does not make the act negligent if an ordinarily prudent person may have made the same error.'" *Hill v. Wilson*, 134 Md. App. 472, 492 (2000) (quoting *Faith v. Keefer*, 127 Md. App. 706, 747 (1999)).

The evidence in this case included various statements to the effect that Mr. Reid "tripped" when he fell on the sidewalk outside of the BACE facility. The apparent source of these statements was Ms. Reid, who did not actually see the fall and thus lacked personal knowledge of how it occurred. When Ms. Reid returned to the facility to seek emergency assistance, she told a BACE employee that Mr. Reid "fell over the height difference between the sidewalk and the dirt[.]" One of the nurses recorded: "while walking to car, [patient] fell over the height difference between the sidewalk and dirt per patient's wife." When an ambulance arrived, Ms. Reid reported that Mr. Reid "had tripped on the sidewalk and fallen[.]" An emergency medical technician recorded: "Per family, patient just came out of ambulatory surgery. Patient had endoscopy done. Patient tripped on sidewalk and fell." One day after the injury, Ms. Reid told a physician

66

that Mr. Reid "did not see a drop off of the ground next to the sidewalk and turned [his] foot on [the] edge of [the] sidewalk" causing him to "fall forward onto [his] knees and right arm."

At trial, the plaintiffs contended that the evidence was insufficient to prove any contributory negligence on the part of Mr. Reid. Counsel argued that the defendants were not entitled to an instruction concerning contributory negligence in a medical malpractice case unless the defendants produced some evidence "that the [patient] had received treatment from a health care provider[,] that [the patient] had been given instructions by that provider[,] and that [the patient] had not followed or unreasonably delayed in following those instructions." Counsel for the plaintiffs also argued that there was no basis to conclude that Mr. Reid did anything unreasonable, such as walking into a hazardous condition.

The circuit court stated that there was a "variety of testimony as to what, how Mr. Reid was doing when he left[,]" which was "not necessarily his testimony, but the statements that were made to the medical personnel that . . . he lost his footing on the corner of the pavement[.]"  The court reasoned that the jury was "free to look at it from a variety of different ways."  Over the plaintiffs' objections, the court delivered a jury instruction based on Maryland Civil Pattern Instruction (MPJI-Cv) 27:5, the pattern instruction that covers contributory negligence in a medical malpractice case. The court instructed the jury:

> The patient cannot recover if the patient's negligence is a cause of the injury. Negligence is doing something that a patient using ordinary care would not do or not doing something that a person using ordinary care

67

would do. Ordinary care means that caution, attention[,] or skill a reasonable person would use under similar circumstances. . . . The [d]efendant has the burden of proving by a preponderance of the evidence that a patient's negligence was the cause of the patient's injury.

In accordance with its ruling, the court included a question on the verdict sheet asking: "Do you find that [Mr. Reid's] own negligence contributed to his fall outside BACE?"

During closing arguments by the defendants, only one attorney specifically mentioned the issue of contributory negligence. Counsel for Nurse Dinisio stated that the question of "whether or not [Mr. Reid] was contributorily negligent" concerned "the whole issue of did he simply trip and fall[,]" which counsel said was "sort of in another way on the causation piece of it."

On appeal, the plaintiffs contend that the circuit court erred by submitting the issue of contributory negligence to the jury. In support of their contention, the plaintiffs rely on *Barbosa v. Osbourne*, 237 Md. App. 1 (2018). In that opinion, this Court explained that a defendant health care provider may not raise the affirmative defense of contributory negligence in a medical malpractice action "unless there is some evidence 'that the injured party acted, or failed to act, with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves.'" *Id.* at 9 (quoting *Thomas v. Panco Mgmt. of Maryland, LLC*, 423 Md. 387, 418 (2011)). Surveying Maryland appellate opinions concerning the availability of a contributory negligence defense in medical malpractice cases, we wrote:

> Our appellate courts have upheld the submission of a contributory negligence issue to a jury, in medical malpractice cases, but only where

68

> there was evidence adduced that [the patient] had received treatment from a health care provider, that [the patient] had then been given instructions by that provider, and that [the patient] had not followed, or unreasonably delayed in following, those instructions.

*Barbosa v. Osbourne*, 237 Md. App. at 10 (citing *Moodie v. Santoni*, 292 Md. at 591; *Hopkins v. Silber*, 141 Md. App. 319, 325, 331 (2001); *Kassama v. Magat*, 136 Md. App. 637, 647, 663 (2001), *aff'd*, 368 Md. 113 (2002); *Smith v. Pearre*, 96 Md. App. 376, 394 (1993); *Myers v. Estate of Alessi*, 80 Md. App. 124, 133 (1989); and *Chudson v. Ratra*, 76 Md. App. 753, 773 (1988)).[15]

As the plaintiffs observe, the evidence in this case did not satisfy the criteria stated in *Barbosa v. Osbourne*, 237 Md. App. at 10. There was no evidence that Mr. Reid failed to follow, or unreasonably delayed in following, any instructions from his health care providers. His health care providers instructed him that he could not drive a vehicle, operate machinery, or drink alcohol for at least 12 hours and that he should avoid making critical decisions or signing legal documents for the rest of the day. No one instructed him that he could not walk to the passenger seat of his car while under the influence of anesthesia. In fact, they allowed him to walk to the car—and their decision to allow him to do so is the basis of the claim of malpractice. The crux of this claim was that Mr. Reid should not have been walking at all, because the defendants' medical negligence impaired his functioning and rendered him incapable of exercising the degree of care for

---

[15] Citing the *Barbosa* opinion, the Comment to MPJI-Cv 27:5 states: "A medical malpractice plaintiff may be held to have been contributorily negligent only where [the plaintiff] received treatment from a healthcare provider, was given instructions by that provider, and did not follow, or unreasonably delayed in following those instructions."

his own safety that an ordinary person would exercise while walking.[16]

Despite the language from *Barbosa v. Osbourne*, the defendants argue that the evidence indicating that Mr. Reid tripped was sufficient to prove contributory negligence. The defendants cite no authority upholding the submission of the issue of contributory negligence to a jury in a medical malpractice case under factual circumstances analogous to the present case. The defendants make almost no attempt to reconcile their proposed theory of contributory negligence with the statement from *Barbosa v. Osbourne*, 237 Md. App. at 10. Only one defendant even acknowledges the cited statement. In his brief, CRNA Sergott asserts that the present case "does not fit the issue mentioned" in *Barbosa*, "where the issue of contributory negligence was allowed only where a patient had been given instructions and failed to follow or unreasonably delayed in following those instructions."

In our assessment, the defendants have failed to establish that their theory of contributory negligence in this medical malpractice case is compatible with the statement from *Barbosa v. Osbourne*, 237 Md. App. at 10, or that it is otherwise supported by other

---

[16] As a basic principle, contributory negligence presupposes primary negligence. *See Booth v. McLean Contracting Co.*, 108 Md. 456, 460 (1908). To the extent that the defendants have attempted to articulate a theory of contributory negligence, they have described it as mutually exclusive of any primary medical negligence. For instance, CRNA Sergott argues that the jury could find that "the care given to Mr. Reid was completed without a breach of the standard" and that his injuries were "*merely* the unfortunate result of [his] trip and fall over the difference in the height of the pavement." (Emphasis added.) Similarly, Nurse Dinisio argues that jury could find that Mr. Reid "*simply* tripped and fell because he did not see the uneven sidewalk." (Emphasis added.) No defendant has described a factual theory of contributory negligence that might coexist with a finding of primary medical negligence.

70

authorities.  We agree with the plaintiffs, therefore, that the evidence did not properly generate an affirmative defense of contributory negligence.

In addition, we agree with the plaintiffs that the evidence failed to establish a prima facie case of contributory negligence on the part of Mr. Reid.  Contrary to the defendants' suggestions, this case was unlike an ordinary trip-and-fall (or slip-and-fall) negligence case, in which a plaintiff presents evidence of an unsafe condition and it is up to the jury to decide whether the plaintiff unreasonably failed to see and avoid the unsafe condition.  *E.g.*, *Cador v. Yes Organic Market Hyattsville Inc.*, 253 Md. App. 628, 644-45 (2022); *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 394-95 (1997).  At trial, neither the plaintiffs nor the defendants presented evidence that there was any visible hazard that a person exercising ordinary care should have seen and avoided.

The evidence in this case may have been sufficient for a jury to find that Mr. Reid was not looking down while he was walking and that he tripped.  But evidence that a person suffered injury after walking on something that they did not see, without more, is inadequate to conclude that the person was contributorily negligent.

For example, in *Anne Arundel County v. Fratantuono*, 239 Md. App. 126, 141-43 (2018), this Court held that a local government was not entitled to a contributory negligence instruction where the plaintiff suffered injuries after stepping on a defective water meter lid on a grassy area next to a public sidewalk.  Although the plaintiff "testified that she was looking ahead while she was walking[,]" the defendant "presented no evidence that she would have observed anything amiss had she been looking down."

71

*Id.* at 142. "The record contain[ed] no indication that anything about the appearance of the lid would have suggested that it would flip if disturbed[.]" *Id.* at 142-43.

Viewed in the light most favorable to the defendants, the evidence may have been sufficient for the jury to find that Mr. Reid may have "tripped" on some unknown "height difference" between the sidewalk and the dirt next to it. No party presented any evidence about the extent of this height difference. Consequently, there was no evidentiary basis to conclude that it was not reasonably safe for Mr. Reid to step where he did.

In her brief, Nurse Dinisio tells us that there was "indisputable photographic evidence" showing that Mr. Reid failed to see "an open and obvious difference in elevation" between the sidewalk and the ground next to it. Yet the only photographs admitted into evidence were taken too far away to evaluate the height difference.[17] A fact-finder would need to resort to speculation to conclude, based on the evidence presented, that an ordinary person exercising due care would have avoided stepping where Mr. Reid stepped.

Although the evidence in this case did not support a defense of contributory negligence, nothing should preclude the defendants on remand from introducing evidence tending to show that Mr. Reid fell because he tripped even though he was capable of walking safely to his car. Evidence that Mr. Reid tripped remains relevant to determining the cause of his injuries. A simple trip-and-fall was one possible explanation. The defendants remain perfectly free to argue, as they did at the first trial, that they are not

---

[17] Appendix B to this opinion includes copies of the photographs admitted into evidence that depict the location of Mr. Reid's fall.

72

liable for Mr. Reid's injuries if he fell simply because he tripped on the edge of the sidewalk and not because of any medical negligence. The circuit court, however, should not instruct the jury on the issue of contributory negligence, nor should it permit the defendants to argue that the evidence proves that Mr. Reid committed contributory negligence.

### Claims of "Independent Negligence" by BACE

In addition to the issues raised by the plaintiffs in this appeal, defendant BACE raises an issue concerning the scope of the remaining issues upon remand. The appellate brief from BACE poses the following question: "If summary judgment in favor of Appellees Jahangir M. Khan, M.D. and Jahangir M. Khan, M.D., LLC is reversed, are the allegations against Appellee Baltimore Center for Endoscopy, LLC in a new trial limited to vicarious liability?"

BACE argues that the plaintiffs failed to present evidence of any "independent negligence" by BACE, i.e., negligence independent from the conduct of its agents or employees. Specifically, BACE points out that the plaintiffs failed to produce expert testimony establishing that BACE's policies violated any applicable standards of care or that any such violation caused Mr. Reid's injuries. BACE argues that, because "[t]he issue of BACE's independent negligence was decided by the trial court" at the first trial, the plaintiffs "cannot attempt to reassert this claim or any new claim for the independent negligence of BACE at the trial on remand."

A review of the transcript supports the assertion that the circuit court actually decided the issue of independent negligence by BACE. At the close of the evidence

73

presented by the plaintiffs, counsel for BACE moved for a "partial [j]udgment" with respect to "any independent allegations of negligence by the facility." The court denied all motions for judgment at that time.

On the next day of trial, counsel for BACE again argued that it was entitled to a judgment as a matter of law with respect to any allegations of independent negligence. Counsel argued that the plaintiffs had never introduced any expert opinion testimony establishing that BACE's policies departed from the accepted standards of care.

The defendants provided an expedited copy of a transcript of Dr. McAlary's trial testimony. Based on the parties' discussions of the content of the transcript, the court concluded that Dr. McAlary had never testified that any policies of BACE violated an applicable standard of care. For that reason, the court said that it was "not going to allow the policy discussion" during the defendants' case and that it was "not going to allow" any theory that BACE's policies breached the standard of care "to go to the jury." In light of the ruling, counsel for the plaintiffs acknowledged that, "at th[at] point," their only claim against BACE rested on a theory of "vicarious liability."

During discussions about the verdict sheet, the court stated that, because there was "no testimony that BACE violated the standard of care[,] . . . BACE itself c[ould ]not be held liable" for its own negligence. At the close of all evidence, the court denied the defendants' renewed motions for judgment, but added: "Basically, BACE is out." In accordance with those rulings, the court did not submit to the jury any questions concerning the negligence of defendant BACE.

This record establishes that the circuit court, in substance, granted a motion for

74

partial judgment in favor of BACE. The court determined that the plaintiffs had failed to produce evidence to support a claim of negligence by BACE, independent from its agents or employees. In the interest of providing more clarity for the parties and any reviewing court, it would have been a better practice for the court to have made a more formal announcement and written record of its ruling. Nevertheless, the transcript demonstrates that the plaintiffs had an adequate opportunity to oppose the motion for partial judgment and that they understood the substance of the court's ruling.

In their reply to BACE, the plaintiffs offer no direct response to the argument that, on remand, their claims against BACE should be limited to a theory of vicarious liability. Rather, the plaintiffs reiterate their contentions that the court improperly excluded the expert testimony that they needed to support their claim of independent negligence by BACE. As explained above, we have rejected those contentions because the plaintiffs failed to make an adequate proffer of the excluded testimony.

In their reply brief, the plaintiffs note that Dr. McAlary stated during cross-examination that he "disagree[d] with the policy" of BACE. The plaintiffs also cite a comment that Dr. McAlary made during redirect examination. Counsel for the plaintiffs asked: "Aside from saying that Mr. Reid needed a wheelchair, would Mr. Sergott be required to speak with Nurse Dinisio about anything else regarding Mr. Reid?" Dr. McAlary responded: "Well, [CRNA Sergott] could justify the basis for the wheelchair, since they had a policy that said if you walk in, you walk out without looking at any of the factors that would make that policy incorrect and not individualized in the specific patient need." Neither his statement expressing "disagree[ment]" with a policy nor his

75

comment that a particular policy was "incorrect" are equivalent to an opinion that any policies violated the standard of care or that any such violation caused Mr. Reid's injuries. *See Retina Grp. of Washington, P.C. v. Crosetto*, 237 Md. App. 150, 176 (2018). Thus, the cited testimony was insufficient to support a claim of independent negligence by defendant BACE.

The plaintiffs have failed to demonstrate any error in the circuit court's ruling granting a partial judgment as to claims of negligence by BACE, independent from its agents or employees. Accordingly, we affirm the judgment to the extent that includes a partial judgment on that issue. At a second trial on remand, the claims against BACE are limited to a theory of vicarious liability.

The partial judgment on that issue does not necessarily mean that the plaintiffs are barred from presenting evidence about BACE's policies on remand. Evidence that Dr. Khan knew (or should have known) that BACE's existing policies did not require the use of a wheelchair may be relevant when assessing allegations that he failed to comply with the standard of care. Moreover, it remains unclear whether the evidence will show that Dr. Khan had authority or control over BACE's policies.

At his deposition, Dr. McAlary opined that there were "[t]wo mechanisms" by which Dr. Khan could have complied with the standard of care—he could have ordered Nurse Dinisio to provide a wheelchair "as part of the discharge instructions" or he "could have created a policy" requiring the use of a wheelchair for patients with certain risk factors. Dr. McAlary opined that "there was no mechanism taken either by policy or

order to protect this patient from this occurrence."[18] If the plaintiffs produce evidence indicating that Dr. Khan had authority or control over BACE's policies, then the plaintiffs may pursue their theory that Dr. Khan committed negligence by failing to act either by order or by policy. This proposed theory would not entail any claim of "independent negligence" by BACE. Rather, this theory would support a claim of underlying negligence by Dr. Khan (or Jahangir Khan, M.D., LLC) for which BACE might be found vicariously liable.

## CONCLUSION

For the reasons stated in this opinion, the judgment is affirmed in part and reversed in part. The case is remanded for a new trial on some but not all claims.

The judgment is reversed to the extent that it includes the order granting summary judgment in favor of Dr. Khan and Jahangir Khan, M.D., LLC. The judgment is reversed to the extent that it concerns claims that BACE is vicariously liable for alleged negligence of Dr. Khan and Jahangir Khan, M.D., LLC. The "related specialty" requirement of the Health Care Malpractice Claims Act does not prohibit Dr. McAlary from offering expert opinion testimony that Dr. Khan departed from the standard of care in his post-procedure discharge assessment of Mr. Reid.

The judgment is affirmed to the extent that it includes the jury verdicts in favor of CRNA Sergott and Nurse Dinisio. The judgment is affirmed to the extent that it concerns

---

[18] At the summary judgment hearing, counsel for Dr. Khan acknowledged that the allegations against him encompassed the theory that "he should have had a policy" that would "require a wheelchair" for patients with certain risk factors.

claims that BACE is vicariously liable for alleged negligence of CRNA Sergott or Nurse Dinisio.

The judgment is also affirmed to the extent that includes the grant of a partial judgment in favor of defendant BACE, as to claims of negligence independent from its agents or employees. This case is remanded for a new trial on the remaining claims against Dr. Khan, Jahangir Khan, M.D., LLC, and BACE.

At a trial on the remaining claims, the circuit court should not provide jury instructions on contributory negligence, nor should it submit questions about contributory negligence to the jury. The court may permit the defendants to argue that Mr. Reid fell not because of any medical negligence but because he simply tripped. The court should not permit the defendants to argue that Mr. Reid committed contributory negligence.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEES JAHANGIR KHAN AND JAHANGIR KHAN, M.D., LLC, REVERSED. JUDGMENT AFFIRMED AS TO APPELLEES DARLENE DINISIO AND GARY SERGOTT. JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AS TO APPELLEE BALTIMORE AMBULATORY CENTER FOR ENDOSCOPY, LLC. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANTS AND 50% BY APPELLEES (EXCLUDING DINISIO AND SERGOTT).**

As phrased in the appellant's brief, the questions presented are:

1.  Did the Trial Court err in granting summary judgment to Dr. Khan when it correctly recognized that post-procedure fall-risk assessments for patients undergoing anesthesia is cross-disciplinary and not unique to any specific specialty – from a specialist physician (including gastroenterologists and anesthesiologist) all the way down to a medical technician (in this case, a licensed practical nurse), yet Appellants' otherwise imminently qualified expert (a board-certified practicing anesthesiologist) was not the correct expert to opine on the post-procedure assessment of fall risk after anesthesia by a physician.?  []

2.  Did the Trial Court err in granting summary judgment to Dr. Khan when it ignored that fall risk assessments are performed thousands of times every day across the State of Maryland in a variety of practice settings – many times by minimally licensed/trained/qualified staff – and found that there is no overlap in post-procedure fall risk assessments between a gastroenterologist and an anesthesiologist – which would be one of the common scenarios in which both specialists' paths cross on a daily basis.  []

3.  Did the Trial Court err in granting summary judgment to Dr. Khan when it entirely failed to address Appellants' imminently qualified secondary standard of care expert (a board-certified internist) – who also opined as to whether the patient was a fall risk under the influence of anesthesia.  []

4.  Did the Trial Court err in (1) reading the jury instruction for contributory negligence to the jury and/or (2) in allowing the question of contributory negligence to be posed to the jury on the Verdict Sheet, despite the fact that there was no evidence of contributory negligence generated in this case?

Did the Trial Court err in granting summary judgment to Dr. Khan when the remaining Appellees bootstrapped onto this ruling and argued that Dr. Kahn's lack of negligence proves their lack of negligence.

5.  Did the Trial Court err in prohibiting Appellants' Expert Witness, Steven Krasnow, M.D., from testifying regarding the effect of anesthesia on blood pressure and that the anesthesia caused Mr. Reid to fall, even though Dr. Krasnow was already qualified to serve as an expert in the case, was familiar with anesthesia, was familiar with the effects of anesthesia on blood pressure, was familiar with the fall risks associated with anesthesia, and was familiar with the anesthesia in this case.

6.  Did the Trial Court err in prohibiting Appellants' Expert Witness Brian McAlary, M.D. from testifying against Appellee BACE's faulty policies and procedures

even though Dr. McAlary previously testified at a discovery deposition that the policies and procedures of BACE, even if perfectly followed, led to the injuries that Mr. Reid sustained.

7. Did the Trial Court err in not adding Defendant/Appellee Baltimore Ambulatory Center for Endoscopy's ("BACE") name to the Verdict Sheet despite Plaintiffs/Appellants specifically requesting that it be included?





A3



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
6A

C0-2CV19-1344



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT 1/5/24
6B
AD
Cco3009-1344

A5